984 A.2d 262

**Davon Nathan MARKHAM**

v.

**STATE of Maryland.**

**No. 424, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

Nov. 25, 2009.

Brian L. Zavin (Nancy S. Forster, Public Defender, on brief), for Appellant.

Robert Taylor, Jr. (Douglas F. Gansler, Atty. Gen., on brief), for Appellee.

Panel: HOLLANDER, GRAEFF, JAMES A. KENNEY, III, (Retired, Specially Assigned), JJ.

GRAEFF, J.

A jury sitting in the Circuit Court for Prince George's County convicted Davon Nathan Markham, appellant, of two counts of first degree murder, one count of attempted murder, and three counts of use of a handgun in the commission of a felony. The court imposed consecutive sentences of life without the possibility of parole for each of the first-degree murder convictions, life for the attempted murder conviction, and 20 years for each of the three convictions for use of handgun in the commission of a felony.

Appellant presents the following four issues on appeal, which we quote:

1. Did the trial court err by granting the State's motion to close the courtroom during the testimony of a witness based on the State's proffer that the witness had been threatened by a member of Appellant's family who was not even present during trial?

2. Did the trial court err by denying Appellant's motion to exclude the testimony of the State's fingerprint expert as a result of a discovery violation or, in the alternative, Appellant's motions to compel discovery and to hold a *Frye–Reed* hearing?

3. Was Appellant tried in violation of Criminal Procedure Article § 6–103 and Maryland Rule 4–271?

4. Was the evidence sufficient to convict Appellant of the murder of Duane Nichols and the use of a handgun in the commission of that crime?

For the reasons set forth below, we shall reverse the judgments of the circuit court and remand for a new trial.

## FACTUAL AND PROCEDURAL BACKGROUND

On June 28, 2007, appellant was indicted, in the Circuit Court for Prince George's County, for the murder of Michael Lamont Stewart and Duane Edward Nichols, attempted murder of Daryl Fitzgerald, and three counts of use of a handgun in the commission of a felony. Trial was initially scheduled for December 11, 2007. Appellant filed a motion for continuance to allow for an evaluation regarding his competency and his plea of not criminally responsible by reason of insanity. Trial was reset for Monday, January 28, 2008.

On January 25, 2008, the State was advised, and then informed appellant, that fingerprints on the vehicle in which Michael Stewart was shot had been identified as appellant's fingerprints. Appellant promptly moved to exclude the recently-obtained fingerprint evidence. The court denied the motion. Appellant then moved to continue the trial. Counsel for appellant explained that, due to the late disclosure of the fingerprint evidence, he was not prepared to proceed with trial on the following Monday. He requested that the trial be moved to February 4, 2008, and he informed the judge that he could be ready to try the case on that day.

On January 30, 2008, appellant filed three motions. First, appellant "renewed" his motion to exclude the "last-minute fingerprint evidence," arguing that "[t]he continuance of the trial by a single week is an inadequate remedy for the extraordinarily late revelation of such important and complex evidence in a case involving first degree murder allegations as well as a charge of attempted first degree murder." Second, in the event that the court again denied the motion to exclude the evidence, appellant filed a motion requesting a *Frye–Reed* hearing, arguing that there "is no scientific basis for fingerprint examiners to opine as to 'individualization' or 'matches.'" Third, appellant filed a Motion to Produce Records Regarding Fingerprint Analysis. On February 1, 2008, appellant filed a Motion to Compel Discovery "in light of the State's belated revelation of fingerprint evidence...."

On February 4, 2008, the trial date, the State filed an opposition to defendant's motion to exclude the testimony of

the fingerprint examiner and his request for a *Frye–Reed* hearing. The court held a hearing on appellant's pretrial motions concerning the newly-discovered fingerprint evidence. With respect to his request for the exclusion of the evidence, appellant argued that the late disclosure prevented him from securing an expert witness and adequately preparing for cross-examination of the fingerprint examiner. He further argued that it forced him to "choose between his right to a speedy trial within *[Hicks]* and his right to a fair trial. . . ."

The State responded that it had arranged for counsel for appellant and her expert witness to meet with and question the fingerprint examiner, Merina Davis. It further argued that it had consented to all requests for a continuance. With respect to the delay in notifying appellant of the fingerprint evidence, the State advised that it asked for appellant's prints to be examined in August 2007. On December 28, 2007, however, Ms. Davis notified the State that she was never given the known fingerprints of appellant. Thereafter, on January 15, 2008, Corporal Shawn Jones, an employee at the Prince George's County Department of Corrections, captured appellant's finger and palm prints. That same day, Sergeant Ted Jones, an employee of the State's Attorney's Investigative Unit, picked up and delivered the prints to the Fingerprint Examination Unit for Prince George's County. At no point, the State argued, was there any act of intentional deception or of actual negligence.

The court denied the motion to exclude the testimony of the fingerprint examiner and the motion to compel discovery, stating that it was "satisfied that the State has provided the documentation and information in the discovery pursuant to [Maryland Rule 4–263.]" The court noted that appellant "had an opportunity to go and interview and examine the expert." It also found significant that appellant had access to this information, and a similar motive to uncover it, because he was planning on calling the same expert in his case-in-chief.[1]

---

1. Appellant had subpoenaed Ms. Davis to testify in his case when the initial print comparisons showed that the prints of Dawon Markham,

Appellant then asked the court to "grant leave for a *Frye–Reed* hearing," arguing that this hearing was necessary to "force the State to meet it's [sic] burden to show that the methodology used by this latent print examiner in this case ... is the methodology generally accepted in the community." The State responded that the ACE–V method [2] "clearly is generally accepted within the field," and "[t]herefore, it would literally be a waste of the Court's time [ ] to hold a *Frye–Reed* hearing...." The court denied appellant's motion for a *Frye–Reed* hearing, finding that the ACE–V methodology "is a generally accepted method of fingerprint analysis that is in the scientific community."

After the court ruled on the pre-trial motions, the court conducted voir dire and the jury was chosen. The next day, February 5, 2008, before opening statements, appellant moved to dismiss the proceedings for a violation of *Hicks*,[3] arguing that the *Hicks* deadline had expired the day before. Appellant maintained that the *Hicks* date is the swearing in of the jury or the first submission of evidence. He argued that, because the proceedings the previous day ended before the jury was sworn, and there had been no attempt by the State to seek or obtain a good cause postponement by which the *Hicks* date could be exceeded, his charges must be dismissed. The court denied the motion to dismiss.

Daryl Fitzgerald was called as a witness for the State. He testified that, on the evening of April 29, 2007, he and his brother, Jeremiah, were driving around the Fairmont Heights Section of Capitol Heights, Maryland, looking for their crack-addicted uncle. The men stopped at a house, 1307 Early Oaks Lane, a known "drug area" where his uncle previously had "hung out."

---

appellant's twin brother, were found on the vehicle, but there was no evidence of appellant's prints on the vehicle.

2. ACE–V is an acronym for the steps taken in this process, which are analyze, compare, evaluate and verification.

3. *State v. Hicks*, 285 Md. 310, 320, 403 A.2d 356 (1979).

While Jeremiah knocked on the door, Mr. Fitzgerald walked across the street to say hello to Michael Stewart, a man whom Mr. Fitzgerald had "dealings with," but did not know by name, who was sitting in his Black Cadillac. Mr. Fitzgerald then walked back toward his car and leaned on the hood of his trunk. Jeremiah walked over to Mr. Fitzgerald, handed Mr. Fitzgerald a cell phone, and said that their cousin was calling.

While on the phone with his cousin, Mr. Fitzgerald heard "about five or more" gunshots from behind him, and he turned around to see a person firing into Mr. Stewart's car. Mr. Fitzgerald was shot once in the back of his head and three times in his left arm. Despite his injuries, Mr. Fitzgerald drove himself to the hospital.

At the time of the trial, Mr. Fitzgerald could not recollect if the police had visited him while he was at the hospital. He did recall that he spoke to a police officer on May 3, 2007, the day he was released from the hospital, and he signed a written statement that the police transcribed for him.[4] At that time, he told the police that "a guy by the name of Fat Man shot me." He also identified a photograph of "Fat Man" as the person who shot him, and he identified a photograph of appellant's twin brother, who Mr. Fitzgerald described as a friend. At trial, Mr. Fitzgerald identified appellant, "Fat Man," as the person who shot him and Mr. Stewart.

Officer Robert Turner, a 15–year–member of the Prince George's County Police Department and the lead investigator on the case, testified that he met with Mr. Fitzgerald on April 30, 2007, at the hospital, and on May 3, 2007, after Mr. Fitzgerald was released from the hospital. On the second occasion, Officer Turner showed Mr. Fitzgerald a picture of appellant's twin brother, Dawon Markham, who Mr. Fitzgerald identified as "the guy who pushed the brother who was shooting." Officer Turner also showed Mr. Fitzgerald a photograph of appellant. Mr. Fitzgerald stated: "That's who shot

---

4. Mr. Fitzgerald denied reading the statement before he signed it, although he was given an opportunity to do so.

me and he shot the guy in the car." Officer Turner wrote Mr. Fitzgerald's statements on the photographs, which Mr. Fitzgerald signed. Mr. Fitzgerald stated that he had known appellant and his brother "since childhood from the neighborhood."

Corporal Tyrone Brown, a 10–year member of the Prince George's County Police Department, who was assigned to the Forensic Services Division evidence unit, processed Mr. Fitzgerald's vehicle. Corporal Brown photographed the vehicle, and he lifted latent fingerprints off of the vehicle.

Tina Perruzzi, an evidence technician in the Prince George's County Forensic Services Division, testified that on April 29, 2007, she responded to a call for a homicide at the 1300 block of Early Oaks Lane. She arrived at approximately 10:00 p.m. and processed the scene. She took photographs, completed a diagram, and collected items of evidence, including cartridge casings. On the following day, April 30, 2007, Ms. Perruzzi processed Mr. Stewart's black Cadillac. She photographed the interior and exterior of the vehicle, recovered one cartridge casing from the driver's seat of the vehicle and one from the rear of the vehicle, and collected six latent prints from the vehicle. Ms. Perruzzi sent the latent prints to the Fingerprint Identification Unit and the shell casings from the scene and from the car to the Firearms Examination Unit.

Beverly Lancaster, appellant's aunt, also testified for the State. Pursuant to the State's request, and over appellant's objection, the court closed the courtroom and ordered all nonessential court personnel to leave the courtroom during Ms. Lancaster's testimony.

Ms. Lancaster stated that, on the evening of April 29, 2007, she heard "three or four" gunshots while sitting in the basement of her residence, 1307 Early Oaks Lane. She was unable to ascertain if the shots were fired from inside or outside the residence. After hearing the shots, she observed approximately eight "friends and family," some of them with weapons, running down the steps and out through the back door. Included among these people were appellant, his twin brother

Dawon, and appellant's mother, Tara Lancaster, who is Ms. Lancaster's sister.

Although the day before trial Ms. Lancaster told the State that she saw appellant with a gun in his hand as he ran down the steps, at trial she testified that she was mistaken. She testified that the people she observed with guns were appellant's brother and another individual, "Fats," who also happened to be a twin. In response to this change in testimony, the State asked Ms. Lancaster if she had been threatened. Ms. Lancaster explained that she had received a threat the previous day, stating "that somebody was going to kill [her]" if she showed up in court. She acknowledged that, prior to receiving the threat, she never had mentioned that there were two sets of twins in the residence on April 29, 2007.

Ms. Lancaster testified that she left the residence through the back door, and she took a walk to "clear [her] mind." Ms. Lancaster returned to the residence approximately seven to eight hours later with her boyfriend, Michael Mackesy. Mr. Mackesy discovered Duane Edward Nichols lying dead on the floor of the bathroom. Mr. Mackesy then called the police.

Evidence technician Corporal Anthony Ratcliff arrived at 2:56 a.m. to process the scene of 1307 Early Oaks Lane. Corporal Ratcliff observed a black male victim, later identified as Mr. Nichols, lying in blood on the bathroom floor. After the victim was moved, Corporal Ratcliff recovered a bullet from the bathroom floor. He also collected two bullet fragments from the steps in front of the house.

Prince George's County Police Officer Kenneth Hartmann responded to "a priority one call" on April 29, 2007, for a shooting on the 1300 block of Early Oaks Lane. When he arrived, he observed a body inside a vehicle, later determined to be Mr. Stewart, "slumped over on the side over the center console." He conducted a canvass of the area, but he did not find any witnesses. At approximately 2:00 a.m. on April 30, 2007, Officer Hartmann responded to a call indicating that a body, later determined to be Mr. Nichols, was found in the residence at 1307 Early Oaks Lane.

Assistant Medical Examiner James Locke conducted autopsies on the bodies of Mr. Stewart and Mr. Nichols. Dr. Locke noted in the autopsy report that Mr. Stewart suffered five gunshot wounds to his body, that there was evidence of close range firing near one of the gunshot wounds, and that Mr. Stewart died of multiple gunshot wounds. Three bullets were recovered from Mr. Stewart's body.

Dr. Locke testified that Mr. Nichols' body arrived at his office at 9:00 a.m. on April 30, 2007, and he had been dead for approximately 12 hours. Dr. Locke concluded that Mr. Nichols died of a single gunshot wound to the head, and that the "bullet passed through his skelp [sic] and skull, did extensive damage to his brain, [and] exited through the right temple region of his head."

Officer Jeremy Webb attended the autopsies of both victims. He collected items of clothing, blood samples, and fingernail clippings. He also collected the three bullets recovered from Mr. Stewart's body.

Terry Eaton, forensic firearms and toolmark examiner with the Prince George's County Police Department, was admitted as an expert in the field of firearms identification. On November 12, 2007, Mr. Eaton examined the three bullets recovered from Mr. Stewart's body, twelve shell casings collected from the 1300 block of Early Oaks Lane, the bullet recovered from the bathroom floor of 1307 Early Oaks Lane, and the two bullet fragments recovered from the steps of the residence. He concluded that the twelve shell casings were .9 millimeter Luger cartridge casings, and they were all fired from the same firearm. The three bullets recovered from Mr. Stewart's body were .9 millimeter Luger bullets, which were fired from the same firearm. Mr. Eaton also concluded that the bullet found in the bathroom with Mr. Nichols was a .9 millimeter Luger bullet that had been fired from the same gun as the bullets found in Mr. Stewart's body.

Mertina Davis, a fingerprint specialist for the Prince George's County Police Department, was admitted as an expert in the field of fingerprint examination. Ms. Davis testi-

fied regarding the process used in Prince George's County to compare a latent print to a known print, referred to as the ACE–V method. Ms. Davis stated that latent prints are collected by evidence technicians and submitted to her unit in a sealed envelope. She testified that on January 24, 2008, she compared a latent palm print lifted from the driver's door of Mr. Stewart's vehicle with a known print of appellant. After identifying "fifteen plus" common points between the latent print and appellant's print, Ms. Davis concluded that it was a match.

At the close of the State's case, appellant made a motion for judgment of acquittal on the charges of first-degree murder of Duane Nichols and use of a handgun in the commission of that felony. The court denied the motion. Appellant did not call any witnesses on his behalf, nor did he testify in his own defense. After entering three joint exhibits into evidence by consent, appellant renewed his motion for judgment of acquittal. The court denied the motion.

The court then instructed the jury, and the State and appellant delivered closing arguments. The jury returned a guilty verdict on the charges of first degree murder of Michael Stewart and Duane Nichols, attempted murder of Darryl Fitzgerald, and the three counts of use of handgun in the commission of a felony.

We shall include additional facts in our discussion.

## DISCUSSION

### I.

### Closing of the Courtroom

Appellant first contends that the circuit court erred in granting the State's request to close the courtroom during the testimony of Beverly Lancaster, arguing that this violated his constitutional right to a public trial as guaranteed by the Sixth Amendment. In response, the State argues that "the court was within its discretion in allowing for the limited

closure of the courtroom for the testimony of one witness who had been threatened with death if she testified."

The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right to a ... public trial...." U.S. CONST. amend. VI. As this Court recently stated:

> A public trial "furnishes the public with the opportunity to observe the judicial process, and thus ensures that the 'judge and prosecutor carry out their duties responsibly.'" *Walker v. State*, 125 Md.App. 48, 68, 723 A.2d 922 (1999) (quoting *Waller [v. Georgia*, 467 U.S. 39, 46, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984)) ]. Indeed, "[t]he knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power." *In Re Oliver*, 333 U.S. 257, 270, 68 S.Ct. 499, 92 L.Ed. 682 (1948). It thus is "a safeguard against any attempt to employ our courts as instruments of persecution." *Id.* And, finally, it "'encourages witnesses to come forward and discourages perjury.'" *Walker, supra*, 125 Md.App. at [68–]69, 723 A.2d 922 (quoting *Waller, supra*, 467 U.S. at 46, 104 S.Ct. 2210).

*Longus v. State*, 184 Md.App. 680, 688, 968 A.2d 140, cert. granted, 409 Md. 47, 972 A.2d 861 (2009).

■ The right to a public trial, however, "is not absolute." *Robinson v. State*, 410 Md. 91, 102, 976 A.2d 1072 (2009); *Carter v. State*, 356 Md. 207, 216, 738 A.2d 871 (1999). In some circumstances, the trial court can close the courtroom "in order to maintain order, to preserve the dignity of the court, and to meet the State's interests in safeguarding witnesses and protecting confidentiality." Robinson, 410 Md. at 103, 976 A.2d 1072 (quoting *Walker v. State*, 125 Md.App. 48, 69, 723 A.2d 922 (1999)). The Court of Appeals has cautioned, however, that "criminal trials are to be open to the public as a matter of course, and any closure of the courtroom for even part of the trial and only affecting some of the public must be done with great caution." *Id.* at 102, 976 A.2d 1072.

Before closing a courtroom, certain requirements must be satisfied. In *Waller v. Georgia*, 467 U.S. at 48, 104 S.Ct. 2210, the Supreme Court set forth a four factor test, which requires: (1) "the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced"; (2) "the closure must be no broader than necessary to protect that interest"; (3) "the trial court must consider reasonable alternatives to closing the proceeding"; and (4) the trial court "must make findings adequate to support the closure." *Accord Robinson*, slip op. at 7–8; *Longus*, 184 Md.App. at 689, 968 A.2d 140.

Here, the State's request to close the courtroom was made prior to the testimony of Beverly Lancaster. The State made the following proffer:

> The State had Ms. Lancaster here yesterday. She was here all day. Overnight she claims to have received threats through a third party. Those threats allegedly were sent by the defendant's father indicating that if Ms. Lancaster testifies in this case that she would be killed. There is a prior allegation that earlier on, immediately after the incident in question, that a threat was made by either the defendant or his brother against Ms. Lancaster threatening to kill her. Based upon that, based upon the fact that we know that the defendant's father has already been convicted in a homicide case and that his uncle is also serving time for a homicide conviction, we believe these threats to be legitimate and as such we're making a formal request that when Ms. Lancaster comes in that the courtroom be sealed and that all nonessential personnel be asked to leave the courtroom, and that Ms. Lancaster be permitted to come in the courtroom through the back door escorted by sheriffs and exit through the back door escorted by sheriffs.

Defense counsel objected. Initially, he objected to Ms. Lancaster being escorted to the witness stand by the sheriff in front of the jury. After that concern was resolved, counsel continued with his objection:

Mr. Markham has a right to an open trial and a public trial. Having spoken with Ms. Lancaster now, she is a witness who says almost anything that pops into her head at any time. She's given at least three different versions of events, so it makes it very difficult to really assess her credibility when she says that somebody has threatened to kill her.

She explained that she was under the influence of alcohol and drugs when she spoke to the police initially, and when she made her written statement. So, to read much into her allegations takes a vivid imagination. So, the defense is not nearly as persuaded as the Government is that there's any legitimacy to this whatsoever.

The court granted the State's request to close the courtroom during Ms. Lancaster's testimony. It stated: "Other than the witness being called in this case, at this point in time anyone that's not involved in this case, please step outside and remain outside until my deputy or my bailiff directs you to return to the courtroom, that means everybody outside."

Appellant contends that "none of the prongs of the *Waller* test were satisfied...." Specifically, he asserts: (1) "there was no cause for closing the courtroom to everyone but the parties, the witness, and essential court personnel"; (2) "the court's order was overbroad"; (3) "the court made no effort to find an alternative to total closure"; and (4) "the court made no findings in support of its ruling."

The State argues that the court's order instructing anyone who was not involved in the case to exit the courtroom during the testimony of Ms. Lancaster amounted to a partial closure of the courtroom, which required a "substantial reason," as opposed to an "overriding interest" in closure. Moreover, the State maintains that the court did not err in failing to consider reasonable alternatives to closure *sua sponte* because "the partial closure ordered by the court was narrowly tailored to address a single, documented problem, the death threats against a particular witness .... [and appellant] did not suggest any alternatives to that partial closure." The State concedes that the court "did not put any findings in support of

its ruling on the record." It argues, however, citing *United States v. Farmer,* 32 F.3d 369, 370 (8th Cir.1994), that specific findings are not necessary if the record shows support for a closure. In the alternative, the State contends that, if this Court finds that the absence of specific findings on the record was error, the proper remedy is to remand the case for such a finding, not to reverse appellant's convictions.

With respect to the first factor, the "overriding interest" or "substantial reason" for closure, we recognize the seriousness of the problem of witness intimidation. Clearly, the State has a compelling interest in guarding against the intimidation of individuals who testify. See *Longus,* 184 Md.App. at 696, 968 A.2d 140 (State's interest in securing testimony, uninfluenced by intimidation, is "at least a substantial reason for the partial courtroom closure"); *State v. Mahkuk,* 736 N.W.2d 675, 685 (Minn.2007) (protection of witnesses from intimidation is an overriding state interest); *Feazell v. Nevada,* 111 Nev. 1446, 906 P.2d 727, 729 (1995) (witness' "interest in personal safety qualifies as both a 'substantial reason' and an 'overriding interest' "); *People v. Frost,* 100 N.Y.2d 129, 760 N.Y.S.2d 753, 790 N.E.2d 1182, 1188 (2003) (witnesses' "legitimate fears of testifying" established an overriding interest).

The problem in this case, however, is that the trial court failed to make the requisite case-specific findings necessary to justify a closure of the courtroom, as required by *Waller.* In addressing this issue, we find the Court of Appeals' decision in *Carter,* 356 Md. at 221–26, 738 A.2d 871, to be dispositive.

In *Carter,* the question was whether the "trial court's closure of a courtroom during the testimony of a 14–year–old victim of sexual abuse, without making a case-specific finding of fact on the record demonstrating a sufficient basis for this action, violate[d] the accused's Sixth Amendment right to a public trial." *Id.* at 210, 738 A.2d 871. The prosecution proffered that the nature of the offense and the child's age warranted closure of the courtroom. *Id.* at 211, 738 A.2d 871. The defense objected on the ground that this would violate his right to a public trial. *Id.* The court ordered all spectators to

leave the courtroom, stating "that the child's privacy and tender age in this instance certainly outweighs any significance attaching to the public trial. . . ." *Id.*

The Court of Appeals held that the trial court erred in closing the courtroom without adhering to the *Waller* test. In particular, the Court held that "case-specific finding[s]" were "necessary to justify the closing of the courtroom to the public." *Id.* at 223, 738 A.2d 871. The Court explained:

Even if there were a sufficient basis in this case to close the courtroom, ordinarily, the trial judge must have stated the reason or reasons for doing so on the record. Only in that way will the public be able to be aware of the reasons for closure, and an appellate court able to review the adequacy of those reasons.

*Id.* at 221, 738 A.2d 871. The Court stated that the trial court's failure to make the "requisite case-specific finding[s]" prevented it from determining "whether the closure was necessary or narrowly tailored to protect the State's overriding interest." *Id.* at 223, 738 A.2d 871. Therefore, it held "that the closure violated the petitioner's right to a public trial." *Id.* at 226, 738 A.2d 871.

The Court next addressed the proper remedy for a violation of the right to a public trial. Noting that the denial of a public trial was a " 'structural defect,' " the Court "held that a new trial, rather than remand to supplement the record, is the proper remedy." *Id.* at 224, 738 A.2d 871 (citation omitted).

Here, as the record indicates, and the State concedes, the court failed to make the requisite case-specific findings of fact before closing the courtroom to the public. Consequently, following the mandate of *Carter*, we conclude that the closing of the courtroom infringed upon appellant's Sixth Amendment right to a public trial, and the appropriate remedy is to remand for a new trial.

This Court is aware that other courts have held to the contrary, holding that the lack of specific findings does not require reversal if support for the closure can be ascertained from the record. *See, e.g., Bell v. Jarvis*, 236 F.3d 149, 172

(4th Cir.2000) (reading "nothing in *Waller* that would require a reviewing court to evaluate the trial judge's closure order *solely* on the basis of the explicit factual findings and, thereby, ignore facts of record which fully support the decision"), *cert. denied,* 534 U.S. 830, 122 S.Ct. 74, 151 L.Ed.2d 39 (2001); *Farmer,* 32 F.3d at 371 (specific findings not necessary where the record provides sufficient support for a limited closure); *Woods v. Kuhlmann,* 977 F.2d 74, 77–78 (2d Cir.1992) *(Waller* factors satisfied where "information gleaned" from the record is sufficient to support the partial closure of trial). In light of the controlling nature of *Carter,* however, this Court is required to reverse appellant's convictions.

This opinion should not be construed to suggest that the court on remand cannot close the courtroom for the testimony of Ms. Lancaster. Upon a full evaluation by the trial court, and an articulation of its specific findings, the court may conclude that some form of closure of the courtroom is constitutionally permitted.

## II.

### Fingerprint Evidence

Appellant's second contention is that "the trial court erred by denying [his] motion to exclude the testimony of the State's fingerprint expert as a result of a discovery violation or, in the alternative, [his] motions to compel discovery and to hold a *Frye–Reed*[5] hearing." Because we are reversing appellant's convictions, and the discovery issue will not arise on remand, we will not address it. The issue of the *Frye–Reed* hearing, however, is likely to arise on remand. Therefore, we will address it.

Appellant acknowledges that, in *Reed v. State,* 283 Md. 374, 380, 391 A.2d 364 (1978), the Court of Appeals stated that fingerprint identification is the type of scientific technique that is so generally accepted that a court could take judicial notice

---

**5.** *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923); *Reed v. State,* 283 Md. 374, 391 A.2d 364 (1978).

of its reliability. He argues, however, that the court did not "hold that judges may take judicial notice of the reliability of any particular method for determining whether two or more prints match." Appellant states that he "is aware of no reported decision in Maryland resolving the admissibility of finger or palm print evidence obtained through application of the 'ACE–V' method under the *Frye–Reed* standard...." [6]

■ The State argues that the circuit court properly denied appellant's request for a *Frye–Reed* hearing, stating that "[f]ingerprint comparison evidence long has been found to be of such widely accepted reliability that no *Frye–Reed* test need be conducted." The State further asserts that "[f]undamentally [appellant's] challenge to fingerprint evidence does not go [to] the underlying scientific basis of the evidence" "but to the specific way in which it was conducted in this case." The State contends that the appropriate way to address this type of challenge is through cross examination, not a *Frye–Reed* hearing. We agree.

In *Reed,* 283 Md. at 380, 391 A.2d 364, the Court of Appeals stated that, with "regard to expert testimony based on the application of new scientific techniques, it is recognized that prior to the admission of such testimony, it must be established that the particular scientific method is itself reliable." The Court adopted the test set forth in *Frye v. United States,* 293 F. 1013, 1014 (D.C.Cir.1923), that a scientific method is deemed reliable when it has *"gained general acceptance in the particular field in which it belongs." Reed,* 283 Md. at 381, 391 A.2d 364.

The Court of Appeals subsequently clarified that novel scientific evidence may become admissible either by: (1) satisfaction of the general acceptance test set forth in *Reed;* or (2)

**6.** As the State points out, the print here was a "handprint." Both parties agree, however, that the law regarding fingerprint evidence applies to a handprint. *See United States v. Crisp,* 324 F.3d 261, 265–70 (4th Cir.) (addressing latent palmprint identification in same manner as latent fingerprint identification), *cert. denied,* 540 U.S. 888, 124 S.Ct. 220, 157 L.Ed.2d 159 (2003).

by statute. *Armstead v. State,* 342 Md. 38, 54, 673 A.2d 221 (1996) (DNA profiling evidence); *Goldstein v. State,* 339 Md. 563, 566, 664 A.2d 375 (1995) (laser speed device). *Accord State v. Smullen,* 380 Md. 233, 266, 844 A.2d 429 (2004) (battered spouse syndrome). No statute is involved in this case, and therefore, the issue on appeal involves the "general acceptance" of fingerprint evidence.

In *Reed,* the Court made clear that a hearing is not always required to establish "general acceptance." 283 Md. at 381, 391 A.2d 364. It specifically listed fingerprint evidence as the type of evidence for which a court may take judicial notice of its reliability:

> On occasion, the validity and reliability of a scientific technique may be so broadly and generally accepted in the scientific community that a trial court may take judicial notice of its reliability. Such is commonly the case today with regard to ballistics tests, *fingerprint identification,* blood tests, and the like.

*Id.* at 380, 391 A.2d 364 (emphasis added).

Indeed, fingerprint evidence has been used in criminal trials for many years. In the dissenting opinion in *Reed,* 283 Md. at 418–22, 391 A.2d 364, Judge Smith set forth a detailed history of the admissibility of fingerprint evidence, indicating that the first appellate decision addressing this issue was *People v. Jennings,* 252 Ill. 534, 96 N.E. 1077 (1911). According to Judge Smith, the first reported Maryland decision to address fingerprint evidence was *Murphy v. State,* 184 Md. 70, 85–86, 40 A.2d 239 (1944). *Reed,* 283 Md. at 422, 391 A.2d 364. Since that time, fingerprint evidence routinely has been admitted into evidence. Appellant has cited to no reported case, in Maryland or otherwise, finding that fingerprint evidence is not reliable.[7]

Given the consensus that fingerprint identification is reliable, other courts recently have reaffirmed Maryland's view

---

7. Appellant's sole citation is to a circuit court decision excluding fingerprint evidence.

that a court can take judicial notice of the reliability of fingerprint identification evidence. *See United States v. Crisp*, 324 F.3d 261, 269 (4th Cir.2003) (because Crisp has "provided no reason today to believe that this general adoption of the principles underlying fingerprint identification has, for decades, been misplaced," the district court properly accepted "at face value" the consensus that the technique is reliable), cert. denied, 540 U.S. 888, 124 S.Ct. 220, 157 L.Ed.2d 159 (2003); *State v. Escobido–Ortiz*, 109 Hawai'i 359, 126 P.3d 402, 413 (2005) ("We take judicial notice, based on the overwhelming caselaw from other jurisdictions, that the theory underlying latent fingerprint identification is valid and that the procedures used in identifying latent fingerprints, if performed properly, have been widely accepted as reliable."); *Florence v. Commonwealth*, 120 S.W.3d 699, 702 (Ky.2003) (fingerprint analysis included among types of scientific evidence for which trial judges can take judicial notice that they "have achieved the status of scientific reliability").

In an effort to avoid this consensus on the reliability of fingerprint evidence, appellant focuses his challenge on the "ACE–V" method for making fingerprint identifications. He argues that he is aware of "no reported decision in Maryland" resolving the admission of fingerprint evidence obtained through this method. Before addressing this issue, we briefly will discuss this method of fingerprint analysis.

In *Commonwealth v. Patterson*, 445 Mass. 626, 840 N.E.2d 12, 16 (2005), the Supreme Judicial Court of Massachusetts explained the fingerprint identification "method known as ACE–V (analysis, comparison, evaluation, and verification)." *Id.* at 16. It stated:

In the analysis stage of ACE–V, the examiner looks at three levels of detail ("level one") on the latent print. Level one detail involves the general ridge flow of a fingerprint, that is, the pattern of loops, arches, and whorls visible to the naked eye. The examiner compares this information to the exemplar print in an attempt to exclude a print that has very clear dissimilarities. At this stage, the examiner also looks for focal points—or points of interest—on the latent

print that could help prove or disprove a match. Such focal points are often at the boundaries between different ridges in the print. The examiner will then collect level two and level three detail information about the focal points he has observed. Level two details include ridge characteristics (or Galton Points) like islands, dots, and forks, formed as the ridges begin, end, join or bifurcate. Level three details involve microscopic ridge attributes such as the width of a ridge, the shape of its edge, or the presence of a sweat pore near a particular ridge.

In the comparison stage, the examiner compares the level one, two, and three details of the focal points found on the latent print with the full print, paying attention to each characteristic's location, type, direction, and relationship to one another. The comparison step is a somewhat objective process, as the examiner simply adds up and records the quantity and quality of similarities he sees between the prints. In the evaluation stage, by contrast, the examiner relies on his subjective judgment to determine whether the quality and quantity of those similarities are sufficient to make an identification, an exclusion, or neither.

\* \* \*

Assuming a positive identification is made by the first examiner, the verification step of the process involves a second examiner, who knows that a preliminary match has been made and who knows the identity of the suspect, repeating the first three steps of the process.

*Id.*

Appellant has cited to no case holding that fingerprint evidence based on the ACE–V method is not reliable. We have not been able to find any case so holding. Indeed, the cases that have addressed this issue have found the ACE–V method to be generally accepted.

In *Patterson,* the court held that "the underlying theory and process of latent fingerprint identification, and the ACE–V

method in particular, are sufficiently reliable to admit expert opinion testimony regarding the matching of a latent impression with a full fingerprint." 840 N.E.2d at 15. In rendering that conclusion, the court noted that "[f]ingerprint evidence has been used extensively in criminal investigations and trials for more than one hundred years." *Id.* The court further noted that it was not disputed "that ACE–V is the standard methodology used throughout the United States and other parts of the world" to "compare a latent fingerprint impression to a fully inked fingerprint." *Id.* at 24–26. The Court stated that, "[a]lthough the term ACE–V was not coined until at least 1995, when the Scientific Working Group on Friction Ridge Analysis, Study, and Technology (SWGFAST) documented standards for comparing prints, the steps performed under ACE–V are essentially the same steps performed by fingerprint experts over the last hundred years." *Id.* at 16 n. 4. Accordingly, the court found no error in the trial court's ruling that single latent fingerprint identification is reliable. *Id.* at 33.

Other courts similarly have held that the ACE–V method of fingerprint identification is generally accepted. *See United States v. Mahone,* 453 F.3d 68, 72 (1 st Cir.2006) (in upholding admissibility of fingerprint analysis, the court stated: "ACE–V is clearly highly accepted in the forensics field"); *United States v. Mitchell,* 365 F.3d 215, 221–22, 240–41 (3d Cir.) (general acceptance of fingerprint identification evidence within the forensic identification community weighed in favor of admitting the fingerprint evidence using the ACE–V method), *cert. denied,* 543 U.S. 974, 125 S.Ct. 446, 160 L.Ed.2d 348 (2004); *United States v. Havvard,* 117 F.Supp.2d 848, 855 (S.D.Ind.2000) (ACE–V methodology for latent fingerprint identification "easily satisfies" standards of reliability), *aff'd,* 260 F.3d 597, 600–02 (7th Cir.2001); *Burnett v. State,* 815 N.E.2d 201, 209 (Ind.Ct.App.2004) (recognizing that "the federal courts [in Indiana] have determined that the [ACE–V] methodology is reliable").

Appellant argues, however, that there is criticism regarding "each stage of the 'ACE–V' method." [8] Appellant alleges that "sufficient controversy exists as to the reliability of the 'ACE–V' methodology to justify holding a hearing on its admissibility."

We disagree. As indicated, Maryland has held, for many years, that fingerprint identification evidence is reliable and admissible without a *Frye–Reed* hearing. This view is consistent with the holdings of courts in other jurisdictions. Given the long-standing consensus that fingerprint evidence is reliable, the absence of any suggestion that the ACE–V method of identification differs from that used in the past, and the lack of any reported decision holding that the ACE–V method is unreliable, we cannot find that a trial court is required to revisit this issue and expend scarce judicial resources on a *Frye–Reed* hearing. [9]

---

**8.** Specifically, appellant states that there is "no minimum number of friction ridge details that must be identified before a print is deemed suitable for purposes of the 'Analysis' and 'Comparison' stages" and that, "[a]t the 'Evaluation' stage, [ ] there is no standard for determining when a difference between a latent print and a known print is significant or can otherwise be explained away as the result of the quality of one of the prints." Appellant also argues that the "Verification" stage is "beset by problems, beginning with the fact that the verification need not be blind and need not be conducted by an independently-employed examiner."

**9.** We are not suggesting that, once a scientific technique has been deemed to be reliable, it can never be challenged. Indeed, the Court of Appeals has applied *Frye–Reed* "when considering whether a theory which had been accepted in scientific and legal communities, continues to meet the standard." *Blackwell v. Wyeth*, 408 Md. 575, 589, 971 A.2d 235 (2009) (citing *Clemons v. State*, 392 Md. 339, 896 A.2d 1059 (2006)). In *Clemons*, the Court addressed comparative bullet lead analysis (CBLA), a procedure that compared bullets to determine if they originated from the same original source. *Id.* at 353, 896 A.2d 1059. Although the CLBA theory was at one time generally accepted, the Court held "that CLBA does not satisfy the requirement under the *Frye–Reed* test for the admissibility of scientific expert testimony because several fundamental assumptions underlying the process are not generally accepted by the scientific community." *Id.* at 372, 896 A.2d 1059. The same cannot be said for fingerprint evidence.

The proper method to address appellant's concerns regarding the fingerprint identification was cross-examination of the fingerprint examiner. As the State argues:

> [Appellant's] challenge to fingerprint evidence does not go [to] the underlying scientific basis of the evidence—that the pattern of friction ridges on an individual's hand or finger is unique to that individual, and that one can therefore compare a latent print to a known sample from an individual to form an opinion as to whether that individual left the latent print or not. His complaint, rather, is that the methods of comparison used in this case were not objective enough to allow an expert to form the opinion that the two prints matched. While this may be a legitimate attack on the credibility of the witness or her opinion in this particular case, it does not form the basis for a *Frye–Reed* attack on the admissibility of the evidence per se.

We agree.

In *Crisp,* 324 F.3d at 269–70, the United States Court of Appeals for the Fourth Circuit stated: "[E]ven if we had a more concrete cause for concern as to the reliability of fingerprint identification ... 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" (quoting *Daubert v. Merrell Dow Pharms.,* 509 U.S. 579, 596, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). Similarly, in *Escobido-Ortiz,* 126 P.3d at 413, the Intermediate Court of Appeals of Hawaii stated that "the proper means of attacking an expert's positive fingerprint identification is through rigorous cross-examination or presentation of an opposing expert to challenge the positive identification, not the wholesale exclusion of a reliable methodology."

Here, appellant was able to cross-examine the fingerprint examiner regarding each step of the ACE–V methodology. Defense counsel cross-examined Ms. Davis regarding the method she utilized to determine that a match existed and the way in which this conclusion was verified within her specific laboratory. Appellant's attorney also was given "leeway" in

questioning Ms. Davis as to whether she was familiar with case studies and articles describing fingerprint evidence.

Appellant's concerns appropriately were addressed on cross-examination of the fingerprint examiner. A *Frye–Reed* hearing was not required.

## III.

### Trial Date Violation

Appellant next contends that the circuit court erred in denying his motion to dismiss the charges, arguing that he was tried in violation of Md.Code (2008 Repl.Vol.) § 6–103 of the Criminal Procedure Article ("C.P.") and Maryland Rule 4–271, which require the State to bring a defendant to trial within 180 days. The State argues that appellant was brought to trial within the time deadline.

Maryland Rule 4–271(a)(1) provides that the trial date "shall be not later than 180 days" after the earlier of two triggering events. It provides:

The date for trial in the circuit court shall be set within 30 days after the earlier of the appearance of counsel or the first appearance of the defendant before the circuit court pursuant to Rule 4–213, and shall be not later than 180 days after the earlier of those events.... On motion of a party, or on the court's initiative, and for good cause shown, the county administrative judge or that judge's designee may grant a change of a circuit court trial date. If a circuit court trial date is changed, any subsequent changes of the trial date may be made only by the county administrative judge or that judge's designee for good cause shown.

Maryland Rule 4–271(a)(1).[10] The last day that the trial date can occur pursuant to Rule 4–271(a) "is commonly referred to as [the] *Hicks* date." *Ashton v. State,* 185 Md.App. 607, 619, 971 A.2d 965, *cert. denied,* 410 Md. 165, 978 A.2d 245 (2009).

---

**10.** "[I]dentical provisions" are set forth in C.P. § 6–103. *Ashton v. State,* 185 Md.App. 607, 619, 971 A.2d 965, *cert. denied,* 410 Md. 165, 978 A.2d 245 (2009).

Here, counsel for appellant entered her appearance on August 6, 2007. Thus, the 180th day fell on February 2, 2008. Because this was a Saturday, the parties agree that the "*Hicks* date" was Monday, February 4, 2008. *See* Maryland Rule 1–203(a)(1) (when computing a period of time under the Maryland Rules or under an applicable statute, if the last day of the period "is a Saturday, Sunday, or holiday . . . the period runs until the end of the next day that is not a Saturday, Sunday, or holiday"). On Monday, February 4, 2008, the parties appeared for trial. The parties selected a jury, but the jury was not sworn until the next day, February 5, 2008.

Appellant contends that, although voir dire occurred on February 4, 2008, "the trial did not actually begin until the jury was sworn on February 5." Appellant acknowledges that, "[a]lthough the rule and statute are clear as to when the clock begins to run—the earlier of the appearance of counsel or the first appearance of the defendant before the circuit court— they do not define the point at which the clock stops, referring to it only as '[t]he date for trial.' " Appellant urges this Court to conclude that trial commences, for the purposes of the Hicks rule, only after the jury is sworn. Appellant notes that, in other contexts, such as double jeopardy, "Maryland law treats the swearing of the jury as the beginning of trial." *See, e.g., Alston v. State*, 177 Md.App. 1, 19, 934 A.2d 949 (2007) ("the swearing of the jury is the critical demarcation of when a trial commences for double jeopardy purposes."), *cert. granted*, 403 Md. 304, 941 A.2d 1104 (2008). Appellant argues that "holding that trial commences when the jury is sworn best accords with the purpose of the 180–day requirement, *viz.* 'to assure that criminal charges would be promptly heard and resolved.' "

In response, the State argues that "the trial date was within the time period set forth in Maryland Rule 4–271." The State acknowledges that "there has been little analysis of what constitutes 'the trial date' " for purposes of Rule 4–271, but it argues that, "in other contexts, this Court has made it perfectly clear that trial commences no later than the start of voir dire." The State argues that it "was prepared to, and did,

begin Markham's trial on the rule day." It suggests that the motions filed by defense counsel delayed the swearing of the jury and that adopting appellant's proposed construction of the rule would give him "an unrealistic windfall."

In *State v. Farinholt*, 54 Md.App. 124, 129, 458 A.2d 442 (1983), *aff'd*, 299 Md. 32, 472 A.2d 452 (1984), this Court held that, "[a]s long as a trial is begun within the 180–day limit, any delay in its commencement is irrelevant for purposes of the rule." The question that we must resolve is when the trial began. If the trial began on February 4, 2008, during voir dire, appellant was tried within the 180 day deadline; if the trial began on February 5, 2008, when the jury was sworn, it was beyond the deadline.

We hold that, for purposes of Rule 4–271 and C.P. § 6–103(a), the trial begins upon the start of voir dire. We find *Reed v. State*, 52 Md.App. 345, 350, 449 A.2d 448, *cert. denied*, 294 Md. 653, 452 A.2d 428 (1982), instructive. In *Reed*, this Court interpreted the predecessor of Rule 4–231, which provides that a defendant is deemed to have waived his right to be present if he "voluntarily absents himself after the *trial has commenced.*" (Emphasis added). This Court rejected the argument that trial commenced when the jury was sworn. *Id.* at 351–52, 449 A.2d 448. Although recognizing that "the swearing of a jury is the point at which jeopardy attaches," we stated that "it does not necessarily follow that this is the point at which trial commences for purposes of waiver" of the defendant's right to be present at trial. *Id.* at 351, 449 A.2d 448. Rather, this Court held that, for purposes of waiver of the defendant's right to be present, the trial is deemed to commence "at or before the beginning of" the impaneling of the jury. *Id.*

Federal court decisions interpreting a federal provision analogous to Rule 4–271 are also instructive. The Federal Speedy Trial Act provides that trial "shall commence within seventy days" from the filing of the information or indictment, or from the date the defendant appears before a judicial officer. 18 U.S.C.A. § 3161(c)(1) (2009). Federal courts "con-

sistently have held that for purposes of the Speedy Trial Act a jury trial commences with the beginning of voir dire." *United States v. Richmond,* 735 F.2d 208, 211 (6th Cir.1984).

In *United States v. Howell,* 719 F.2d 1258 (5th Cir.1983), *cert. denied,* 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984), the Fifth Circuit specifically declined to adopt the reasoning in the double jeopardy context that a trial begins when the jury is sworn. The court stated that "the constitutional considerations underlying the double jeopardy clause are 'wholly different from the premises' of the Speedy Trial Act." *Id.* at 1262 (quoting *Gonzalez,* 671 F.2d at 444 n. 4). The Court explained:

> "The reason for holding that jeopardy attaches when the jury is empaneled and sworn lies in the need to protect the interest of an accused in retaining a chosen jury." Howell does not argue, and we do not believe, that Congress had any similar objective in mind when it passed the Speedy Trial Act.

*Id.* (citation omitted).

We agree with this analysis. As the Court of Appeals has stated, C.P. § 6–103 and Maryland Rule 4–271 "codify and implement the chief legislative objective that 'there should be a prompt disposition of criminal charges in the circuit courts.'" *Dorsey v. State,* 349 Md. 688, 700, 709 A.2d 1244 (1998) (quoting *State v. Hicks,* 285 Md. 310, 334, 403 A.2d 356 (1979)). "[T]he mechanism of the *Hicks* Rule serves as a means of protecting society's interest in the efficient administration of justice." *Id.* at 701, 709 A.2d 1244.

A determination that trial begins at the start of voir dire serves the interest in the efficient administration of justice. Accordingly, the trial court properly denied the motion to dismiss.

## IV.

### Sufficiency of the Evidence

Appellant's final contention relates to the sufficiency of the evidence to support his convictions. Despite our

reversal of his convictions, we must address this contention. If we agreed that the evidence was insufficient to support any of his convictions, appellant could not be retried on those charges. *See Lockhart v. Nelson,* 488 U.S. 33, 39, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988) ("[W]hen a defendant's conviction is reversed by an appellate court on the ground that the evidence is insufficient to sustain the jury's verdict, the Double Jeopardy Clause bars a retrial on the same charge."); *Burks v. United States,* 437 U.S. 1, 11, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) ("The Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding.").

Appellant does not challenge the sufficiency of the evidence to support his convictions for the murder of Mr. Stewart, the attempted murder of Mr. Fitzgerald, and the use of a handgun in connection with these offenses. He argues, however, that the evidence was insufficient to support his convictions for the murder of Duane Nichols and the use of the handgun during the commission of that offense. Appellant contends that "there was no direct evidence linking [him] with Mr. Nichols' death," and the circumstantial evidence "was plainly insufficient to establish his guilt beyond a reasonable doubt." Specifically, appellant claims that "the sole evidence" connecting him to the murder of Mr. Nichols was the testimony of Terry Eaton, who testified "that the bullet found underneath Mr. Nichols' body was consistent with having been fired from the same gun used to shoot Mr. Stewart and Mr. Fitzgerald." Appellant maintains that this evidence enabled the trier of fact to "do no more than speculate that [he] was guilty under the circumstances."

The State counters that there was sufficient evidence to support appellant's convictions. It argues that

the jury could quite readily draw the proper inference that Nichols was killed by the bullet found under his body; that the bullet was fired from the gun that Fitzgerald saw Markham use to shoot him and kill Stewart immediately before the shooting, that Markham ran through his nearby

home, shot Nichols—whose body was found in the upstairs of the house, where Markham would have passed en route to the basement exit—and ran through the basement, where Beverly Lancaster also saw him with the gun . . . still in his hand.

When reviewing the sufficiency of the evidence to support a criminal conviction, we must determine, after viewing the evidence in the light most favorable to the State, if " 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Burlas v. State,* 185 Md.App. 559, 568, 971 A.2d 937 (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)), *cert. denied,* 410 Md. 166, 978 A.2d 245 (2009). If the evidence " 'showed directly, or circumstantially, or supported a rational inference of facts which could fairly convince a trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt[,]' then we will affirm the conviction." *Bible v. State,* 411 Md. 138, 156, 982 A.2d 348, 358 (2009) (quoting *State v. Stanley,* 351 Md. 733, 750, 720 A.2d 323 (1998)).

Here, there was sufficient evidence to support appellant's conviction. Beverly Lancaster testified that, while sitting in the basement of her residence, she heard "three or four gunshots" that could have been fired from inside the residence. Ms. Lancaster initially told the State that, after hearing the shots, she saw appellant run down the stairs with a gun and go out the back door. Although she testified at trial that she did not observe appellant with a weapon while running down the stairs, the jury could have inferred that Ms. Lancaster changed her story on the stand because of the threats that she allegedly received. *See Burlas,* 185 Md.App. at 568, 971 A.2d 937 (recognizing that "[t]he fact-finder 'possesses the ability to choose among differing inferences that might possibly be made from a factual situation' ") (quoting *State v. Suddith,* 379 Md. 425, 431, 842 A.2d 716 (2004)).

In addition to evidence that appellant was in the home where Mr. Nichols was killed, and in possession of a gun after

shots were fired, there was evidence permitting an inference that Mr. Nichols was killed by the same gun that killed Mr. Stewart. Terry Eaton, the Firearm Identification Expert, testified that the bullet found on the bathroom floor with Mr. Nichols was fired from the same firearm as the three bullets recovered from Mr. Stewart's body. Given this evidence, and the identification of appellant as the person who shot Mr. Stewart, a rational trier of fact could have found that appellant also shot Mr. Nichols. The evidence was sufficient to support appellant's convictions.

**JUDGMENTS REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.**