Daryl BURNETT, Jr., Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 02A04–0404–CR–221.

Court of Appeals of Indiana.

Sept. 28, 2004.

P. Stephen Miller, Fort Wayne, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Nicole M. Schuster, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Daryl Burnett, Jr., appeals his convictions, following a jury trial, for Kidnapping, a Class A felony, and Robbery, as a Class B felony. Burnett presents two issues for review:

1. Whether the trial court abused its discretion under Indiana Evidence Rule 702 when it allowed the State's fingerprint expert to testify as an expert at trial.
2. Whether the State presented sufficient evidence to sustain Burnett's convictions.

We affirm.

### FACTS AND PROCEDURAL HISTORY

On May 6, 2003, an African American male approached Vicki Quilhot as she was getting out of her vehicle in the parking lot of the Glenbrook Mall in Fort Wayne. The perpetrator ordered Quilhot to get back into her car and showed her his gun. He then sat in the back seat directly behind Quilhot and adjusted the rear-view mirror so that she could not see him. The man told Quilhot that he wanted $500 and went through her purse. He took $250 in cash out of the purse and then told Quilhot that he would kill her if she did not give him more money.

Next, the man gave Quilhot her checkbook and had her write two checks, one for $250 and another for $500. He then ordered her to drive to Bank One and cash the $500 check. At some point, the man moved into the front passenger seat. En route to the bank, the man reclined the front seat and ordered Quilhot to drive in the drive-through lane farthest from the building. After she cashed the check at the drive-through window, Quilhot drove back to the mall parking lot, where the man searched her trunk and then ordered her to walk toward the J.C. Penney store. Quilhot complied and asked the first person she saw to call the police.

Quilhot described the perpetrator as a small, young, African American male with no facial hair who had a small black gun. A Fort Wayne police officer prepared a six-person photograph array, but Quilhot could not make a positive identification. She did point to one man whom she thought "might be" the perpetrator, Transcript at 190, but that man was not Burnett.[1]

During their investigation, police officers lifted a partial latent fingerprint from the rear-view mirror of Quilhot's vehicle. At trial, Eric Black, a latent fingerprint examiner with the Fort Wayne Police Department, testified, over Burnett's objection,

---

1. At that point, the detective who had prepared the photo array pointed to Burnett's photo, told Quilhot that that man was a suspect in other cases, and asked Quilhot if he looked familiar. Quilhot responded "no." Transcript at 177. At trial, Burnett successfully moved to suppress Quilhot's in-court identification of him based on what the trial court described as the detective's "improper" actions during the photo array. *Id.* at 181.

that the partial fingerprint lifted from Quilhot's vehicle matched Burnett's fingerprint. The fingerprint evidence was the only evidence at trial that linked Burnett to the crime. The jury found Burnett guilty as charged, and the trial court sentenced him to a total term of thirty years. Burnett now appeals.

## DISCUSSION AND DECISION

### Issue One: Fingerprint Evidence

Burnett asserts that the trial court abused its discretion when it allowed Black to give his opinion that Burnett's fingerprint matched the partial latent print that police found on Quilhot's rear-view mirror. Specifically, Burnett contends, "Not only did Black lack the credentials and experience to be deemed an expert, but there was a complete failure to establish the reliability of the methodology used to properly compare known and unknown fingerprints." Brief of Appellant at 7 (footnote omitted). We address those arguments in turn.

A trial court has broad discretion in ruling on the admissibility of evidence, and absent an abuse of discretion, we will not disturb the trial court's decision. *Schmid v. State*, 804 N.E.2d 174, 181 (Ind.Ct.App. 2004), *trans. denied*. An abuse of discretion occurs where the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Id.* Further, a claim of error in the admission or exclusion of evidence will not prevail on appeal unless a substantial right of the party is affected. *Id.*

### A. Qualified Expert under Rule 702(a)

■ "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Ind. Evid. R. 702(a). Our supreme court has stated, "Under this rule, a witness may be qualified as an expert by virtue of 'knowledge, skill, experience, training, or education.'" *Kubsch v. State*, 784 N.E.2d 905, 921 (Ind.2003) (quoting Evid. R. 702). And only one characteristic is necessary to qualify an individual as an expert. *Id.* As such, a witness may qualify as an expert on the basis of practical experience alone. *Id.* It is within the trial court's sound discretion to decide whether a person qualifies as an expert witness. *Id.* On appeal, we will not substitute our judgment for that of the trial court. *See id.*

Here, Black testified that he was currently employed with the Fort Wayne Police Department in the Police Laboratory as a full-time latent fingerprint examiner. Black stated that he had held that position for "a little over two years." Transcript at 266. In response to the State's question regarding what has prepared him for his current position as a latent fingerprint examiner, Black stated in relevant part:

Prior to coming to the laboratory in 2001, I was a commissioned police office[r] for the Fort Wayne Police Department for twenty years. The last six years of that I spent as a crime scene manager, as a Sergeant in the crime scene management division. I was certified as a senior crime scene analyst. I'm certified as a medical death investigator for the State of Indiana. . . . The other training I had when I came into the laboratory was such that it was a two[-]year training program. For the first year I dealt with classification and the filing of fingerprints. I looked at a lot of fingerprints, studied them, ridge detail, forscopy (phonetic), things like that. I studied powdering and lifting of fingerprints[,] [c]hemical methods of developing fingerprints[,] and then in the

second year I went into a supervised probation of my work, working in the laboratory with two ... latent print examiners.

*Id.* at 266–67. In addition, Black testified that he has attended various schools and conferences regarding fingerprints, including the following: three annual conferences of the International Association for Identification ("IAI"); a course in basic fingerprint identification through the Bureau of Criminal Identification in Ohio; a course in chemical processing of fingerprints through the Public Agency Training Council; and a course in Advanced Latent Fingerprint Procedures through IAI in Battlecreek, Michigan. Black also stated that he has testified in court as an expert in fingerprint comparison on one previous occasion.

At that point, the State moved the trial court to certify Black as an expert in fingerprints and fingerprint identification. Burnett's counsel sought and received permission to ask preliminary questions of Black, during which he established in relevant part that: (1) Black was not certified as a latent fingerprint examiner because he had not read certain books necessary to take the examination, nor had he been in the field for the requisite period of time to sit for the examination; and (2) during the previous trial in which he testified as a fingerprint expert, he testified that there were no fingerprints on a weapon.

Additionally, as we discuss more fully in subsection B, *infra*, Burnett's counsel asked Black questions about the methodology he used to identify the fingerprint in this case, namely, the ACE–V method, which is an acronym for "analysis, comparison, evaluate, and verify." Transcript at 304. Specifically, Black stated that he learned the ACE–V method during the courses he took from the Bureau of Criminal Identification in Ohio and the Ad-

vanced Latent Fingerprint Procedures course in Michigan. But Black did not know whether the Federal Bureau of Investigation utilizes the ACE–V method, nor did he know the error rate for the ACE–V method. Burnett argued that Black was not a qualified expert, and the trial court disagreed. In particular, the trial court certified Black as an expert and explained its ruling as follows:

Alright. I'll find that based upon his extensive experience and broad based training, including two specialized trainings on identification of fingerprints, together with a number of other educational programs that would supplement that effort to identify fingerprints, that is ... his training and experience in collecting fingerprints, classifying fingerprints all tend to supplement the ultimate issue of identification, in spite of great efforts that counsel made during cross[-examination] of the witness to discount those are all necessary supplements to his training and experience such that he is entitled to testify as an expert.

Transcript at 306–07.

To support his assertion that the trial court abused its discretion when it certified Black as an expert, Burnett focuses primarily on testimony he elicited from Black while his attorney asked preliminary questions at trial. For example, he claims the trial court erred when it certified Black as an expert because: (1) Black is not a certified latent fingerprint examiner; (2) when Black previously testified as a fingerprint expert, he was not required to identify or compare prints; and (3) Black could not answer certain questions about the ACE–V methodology. But the trial court heard all of that evidence and determined that based on his experience and training, Black was a qualified expert in fingerprint identification. Again, we will

not substitute our judgment for that of the trial court on this matter of discretion. *See Kubsch,* 784 N.E.2d at 921 (stating even where reviewing court had "serious doubts" whether police detective qualified as expert, court would not substitute its judgment for that of trial court). And although only one characteristic is necessary to qualify an individual as an expert, the trial court in this case identified two characteristics that, in its view, qualified Black as a fingerprint expert, namely, his practical experience as a senior crime scene manager and his more recent training in fingerprint identification. *See id.* (stating witness may qualify as expert on basis of practical experience alone). Further, to the extent that Black did not know whether the Federal Bureau of Investigation uses the ACE–V method for fingerprint comparison or could not answer particular questions about the ACE–V methodology, that evidence goes to the weight the jury may assign his expert testimony, not the admissibility of his testimony under Rule 702(a). *See Stidham v. State,* 637 N.E.2d 140, 143 (Ind.1994) (stating officer's failure to conduct a particular test on blood splatters goes to weight of evidence, not to whether officer was properly certified as expert witness). Therefore, we conclude that the trial court did not abuse its discretion when it determined that Black qualified as an expert under Rule 702(a).

## B. Reliability of Black's Methodology

Under Rule 702(b), "[e]xpert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable." When determining whether scientific evidence is admissible under Rule 702(b), we consider the factors discussed in *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *See Kubsch,* 784 N.E.2d at 921. In that case, the Supreme Court held that

for scientific knowledge to be admissible under Federal Rule of Evidence 702, the trial court judge must determine that the evidence is based on, among other things, scientifically valid methodology. *Id.* (citing *Daubert,* 509 U.S. at 592–93, 113 S.Ct. 2786). To assist trial courts in making this determination, the Court outlined a non-exclusive list of factors that may be considered: whether the theory or technique can be and has been tested, whether the theory has been subjected to peer review and publication, whether there is a known or potential error rate, and whether the theory has been generally accepted within the relevant field of study. *Id.* (citing *Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786).

Our supreme court has determined that "the concerns driving *Daubert* coincide with the express requirement of Indiana Rule of Evidence 702(b) that the trial court be satisfied of the reliability of the scientific principles involved." *Steward v. State,* 652 N.E.2d 490, 498 (Ind. 1995). Thus, although not binding upon the determination of state evidentiary law issues, the federal evidence law of *Daubert* and its progeny are helpful to the bench and bar in applying Indiana Rule of Evidence 702(b). *See id.* In addition,

Rule 702(b) requires that the court be "satisfied" of the reliability of the underlying scientific principles. The trial court determines preliminary questions with respect to the admissibility of expert testimony under Rule 104(a), which imposes a burden of proof by a preponderance of the evidence. Accordingly, for expert scientific testimony to be admitted under Rule 702(b), the proponent of the testimony must persuade the trial court that it is more likely than not that the scientific principles upon which the testimony rests are reliable.

ROBERT LOWELL MILLER, JR., 13 INDIANA PRACTICE, INDIANA EVIDENCE § 702.207, 408–09 (2d ed.1995) (footnotes omitted). Under Rule 702, the trial courts are "gatekeepers of evidence, to ensure that expert testimony is relevant and rests upon a reliable foundation." *Suell v. Dewees*, 780 N.E.2d 870, 874 (Ind.Ct.App.2002) (quoting *Armstrong v. Cerestar USA, Inc.*, 775 N.E.2d 360, 366 (Ind.Ct.App.2002), *trans. denied*), *trans. denied*. Again, "the trial court's determination regarding the admissibility of expert testimony under Rule 702 is a matter within its broad discretion, and will be reversed only for abuse of that discretion." *Carter v. State*, 766 N.E.2d 377, 380 (Ind.2002) (citations omitted).

■ Initially, although the State does not argue waiver, our review of the transcript shows that Burnett failed to preserve his challenge to the reliability of the ACE–V methodology under Rule 702(b) because he did not raise a specific objection under Rule 702(b) at trial. *See Burge v. Teter*, 808 N.E.2d 124, 130 (Ind.Ct.App. 2004) (concluding party waived appellate review of issue for failing to raise specific objection on Rule 701 grounds at trial). It is well-settled law in Indiana that a defendant may not argue one ground for objection at trial and then raise new grounds on appeal. *Hobson v. State*, 795 N.E.2d 1118, 1123 (Ind.Ct.App.2003), *trans. denied*. Timely objection should be made to any improprieties that may occur during the course of a trial so that the trial judge may be informed and may take effective action to remedy the error or grievance complained of. *Haycraft v. State*, 760 N.E.2d 203, 209 (Ind.Ct.App.2002), *trans. denied*. Objections not timely raised to the trial court are waived on appeal. *See Impson v. State*, 721 N.E.2d 1275, 1280 (Ind.Ct. App.2000) (stating failure to make timely objection constitutes waiver of issue for appellate review).

As we have explained, Black testified at trial regarding his background, training, and experience. The State then asked the trial court to certify him as an expert in fingerprint identification. Thereafter, Burnett's counsel asked a series of preliminary questions regarding Black's training, experience, and the ACE–V methodology Black uses when he identifies fingerprints. After additional questions regarding, among other things, Black's knowledge of the ACE–V method, the trial court asked the State whether it had further questions on redirect "on the area of [Black's] expertise." Transcript at 288. The State asked a few more questions, and Burnett's counsel followed up with more preliminary questions. At the conclusion of preliminary questions, Burnett's counsel argued to the trial court in relevant part as follows:

Judge, ... I believe they are going to ask him opinions in regards to latent prints and known rolled prints and ask if they are a match or not. I'm going to object to that and I object to it now. *He is not qualified, he does not have the scientific training and background as an expert.* [If] you look at what he has said, the methodology that he used, he doesn't know if that's accepted throughout the [c]ountry. He only knows that's the method that he was taught. If he doesn't know if that method is acceptable, it doesn't pass the *Frye* test. I understand *Frye* is not there, but if he doesn't know if it's acceptable, it also doesn't pass the [*Daubert*] test dealing with whether or not that methodology is the methodology that results in a true and accurate opinion.... For the [*Daubert*], you've got to have a methodology so you can test the truth or falseness of something. You can't test the truth or falseness from his situation when he can't even tell me the different methodology and can't tell me if something

that's known methodology such as the FBI uses the same methodology that he is using and that he's been taught. He claims as an expert a person by the name of Ashbaugh who talks about ridgeology then he tells me ridgeology is not the same as ACE–V but it's somehow related.... His college course from anything he has said and I didn't ask him, doesn't deal with fingerprint identification. He's attended a few seminars and works in the lab. He worked in the lab with in[-]house training prior to, three or four months before he ever attended any class, and then he attended various classes and he can't tell me the methodology and therefore, *I'd say he doesn't qualify as an expert, [and] he should not be able to give an opinion under 702 and 703 and there we have it.*

Transcript at 302–03 (emphases added). Later during the bench conference regarding the admissibility of Black's testimony, Burnett's counsel again suggested that, based on Black's testimony, the ACE–V methodology cannot be tested for truthfulness. But when the trial court ruled on Burnett's objection, it determined only that Black was qualified to give expert testimony based on his experience and training. The court did not address whether the ACE–V methodology was reliable under Rule 702(b). After the ruling, Burnett's counsel did not ask for clarification, nor did he ask the court to rule specifically whether the State had established the reliability of the ACE–V methodology under Rule 702(b).

Based on our review of the relevant portions of the transcript, it is clear that the trial court understood that Burnett was objecting to Black's testimony on the grounds that Black was not a qualified expert, and we agree with that interpretation of Burnett's objections and arguments. Although Burnett's counsel discussed certain aspects of the requirements in *Daubert,* counsel's objections and arguments, in the end, repeatedly focused on Black's lack of knowledge and/or experience. Because Burnett did not expressly challenge Black's testimony under Rule 702(b), he has waived that argument for purposes of his appeal.

 Waiver notwithstanding, we agree with the State that Black's testimony sufficiently established the reliability of the ACE–V methodology for purposes of Rule 702(b). Although not controlling, Black's testimony touches on at least one of the *Daubert* factors: whether the theory has been generally accepted within the relevant field of study. *See Kubsch,* 784 N.E.2d at 921. Black testified that he had learned the ACE–V methodology at two schools, one in Ohio and one in Michigan. In particular, the Michigan course on Advanced Latent Fingerprint Procedures was sponsored by the IAI, which is an international association in the field of fingerprint identification. And when Burnett's counsel asked Black whether he knew of any experts that use the ACE–V methodology, the following colloquy occurred:

A: Yes I do.

Q: Can you give me a name of a few?

A: There is a gentleman associated with the Royal Canadian Mounted Police [whose] name is David Ashbaugh. John Vanderkolk with the Indiana State Police, who is also an expert in terms of fingerprints and fingerprint comparison. He is their lab manager. David Green who is the Illinois State Police Laboratory manager. He is their instructor and their chief examiner. There are several.

Transcript at 286–87. Black later explained that Ashbaugh was the author of a textbook entitled *Qualitative and Quantitative Analysis.*

Black's testimony supports the conclusion that the ACE–V methodology is generally accepted by the IAI, an international organization in the field. His testimony also shows that fingerprint experts in several states, including Indiana, Ohio, Illinois, and Michigan, use the ACE–V method for fingerprint identification. Thus, the State established that the ACE–V methodology is generally accepted within Black's relevant field of study and that it is more likely than not that the scientific principles upon which the testimony rests are reliable. *See* MILLER, INDIANA EVIDENCE § 702.207, 409.

Further, although the reliability of the ACE–V methodology has not been established in Indiana state courts, the federal courts in our state have determined that the methodology is reliable under Federal Rule of Evidence 702. *See United States v. Havvard,* 117 F.Supp.2d 848, 855 (S.D.Ind.2000) (holding ACE–V methodology for latent fingerprint identification "easily satisfies" standards of reliability); *aff'd* 260 F.3d 597 (7th Cir.2001); *see also United States v. George,* 363 F.3d 666, 672–73 (7th Cir.2004) (refusing to reconsider holding in *Havvard* that latent fingerprint analysis is reliable and admissible under Rule 702). Thus, had Burnett expressly challenged the reliability of the ACE–V methodology, the trial court could have taken judicial notice of those decisions. *See West v. State,* 805 N.E.2d 909, 913 (Ind.Ct.App.2004) (stating reliability may be established by judicial notice or by sufficient foundation to convince trial court relevant scientific principles are reliable), *trans. denied.* We conclude that the trial court did not abuse its discretion when it admitted Black's testimony under Rule 702.

**Issue Two: Sufficiency of the Evidence**

■ Burnett also asserts that the State presented insufficient evidence to support his convictions for kidnapping and robbery. In reviewing a sufficiency of the evidence claim, we neither reweigh the evidence nor assess the credibility of the witnesses. *Love v. State,* 761 N.E.2d 806, 810 (Ind.2002). We look to the evidence most favorable to the verdict and reasonable inferences drawn therefrom. *Id.* We will affirm the conviction if there is probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Id.*

A person who knowingly or intentionally confines another person while hijacking a vehicle commits kidnapping, a Class A felony. *See* Ind.Code § 35–42–3–2(a)(2). A person who knowingly or intentionally takes property from another person or from the presence of another person by using or threatening the use of force on any person commits robbery, as a Class B felony. *See* Ind.Code § 35–42–5–1(1).

Burnett argues that without Black's testimony regarding the fingerprint evidence, the State could not prove his identity as the perpetrator. Accordingly, Burnett's sufficiency argument hinges upon the success of his claim that the trial court erred when it admitted Black's testimony. We have already determined that the court did not abuse its discretion in that regard.

Additionally, Quilhot's testimony established all of the elements necessary to convict Burnett except his identity. In particular, she testified that a man confined her in her car, took money from her purse, forced her to write two checks, and then made her drive to a bank and cash those checks. Throughout these events, the man was pointing a gun at Quilhot, and he threatened to kill her if she did not comply. Finally, Black's testimony that the partial fingerprint lifted from Quilhot's rear-view mirror matched Burnett's fingerprint was sufficient to establish Burnett as the perpetrator. We conclude that the

State presented sufficient evidence to sustain Burnett's convictions.

Affirmed.

SULLIVAN, J., and BARNES, J., concur.