**James W. MILLER, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 64A03–1008–CR–543.

Court of Appeals of Indiana.

July 27, 2011.

Transfer Denied Oct. 6, 2011.

Bryan M. Truitt, Bertig & Associates, LLC, Valparaiso, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Ann L. Goodwin, Deputy Attor-

ney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

James Miller appeals his convictions for two counts of Class A misdemeanor neglect of a vertebrate animal. We affirm.

### Issues

Miller raises two issues, which we restate as:

I.  whether there is sufficient evidence to support his convictions; and

II. whether the manner in which the animals were confiscated requires the reversal of his convictions.

### Facts

In 2009, Miller owned two horses, which he kept on his property. From May to September of 2009, after receiving complaints from neighbors about the horses, employees of the Porter County Animal Control and Adoption Center ("the PCAC") went to Miller's property on at least three occasions to inspect the horses. During the May 2009 inspection, Miller was informed that the horses were too thin. The PCAC visited the property again that summer and left a tag on Miller's door in an effort to contact him. On September 7, 2009, Judy Bonaventura, the director of the PCAC, checked on the horses and found them to be "very skinny" and without food or water. Tr. p. 6. The next day, with the assistance of the Porter County Sheriff's Department, the PCAC seized the horses and delivered them to Dr. Jerry Rodenbarger, a veterinarian.

Dr. Rodenbarger examined the horses and determined the horses were "inappropriately skinny," which was caused by them not getting enough to eat. *Id.* at 96.

He stated that the horses were receiving substandard care and "that they were not being fed adequately." *Id.* at 83. The horses were anemic and had elevated muscle enzymes. He described the horses as being "in poor body condition." *Id.* at 67. He explained that, based on an Equine Body Conditions Scoring chart, on a scale from one to nine, a five is perfect conditioning. Horses rating below five are thinner and horses rating above a five are fatter. A rating from four to six was within the realm of normal and healthy. Dr. Rodenbarger explained that anything rating three or below "is in trouble and it's not healthy." *Id.* at 72. Based on a visual and hands on assessment, Dr. Rodenbarger classified one horse as a 1.5 and the other as a 2.5.

The horses were not returned to Miller, and on September 18, 2009, the State charged him with two counts of Class A misdemeanor neglect of a vertebrate animal, alleging that he failed to provide adequate food and water to the horses. A jury found Miller guilty of both counts. He now appeals.

### Analysis

#### I. Sufficiency of the Evidence

Miller argues that the evidence is insufficient to support his convictions. The standard of review for claims of insufficient evidence is well settled. We do not reweigh the evidence or judge the credibility of the witnesses, and we respect the jury's exclusive province to weigh conflicting evidence. *Jackson v. State,* 925 N.E.2d 369, 375 (Ind.2010). We consider only the probative evidence and reasonable inferences supporting the verdict and affirm if the probative evidence and reasonable inferences drawn from the evidence could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. *Id.*

. A person who has a vertebrate animal in his or her custody and recklessly, knowingly, or intentionally abandons or neglects the animal commits cruelty to an animal, a Class A misdemeanor. Ind.Code 35–46–3–7(a). "Neglect" means in part to endanger an animal's health by failing to provide or to arrange to provide the animal with food or drink, if the animal is dependent upon the person for such. I.C. § 35–46–3–0.5. At a minimum, the State was required to prove that Miller was reckless, which is defined as engaging in conduct "in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation from acceptable standards of conduct." I.C. § 35–41–2–2(c).

Miller claims there is insufficient evidence to support his convictions because, although they were skinny, "there were no other corresponding ailments or injuries due to the skinniness." Appellant's Br. p. 10. He contends that he provided the horses with food and water and it was his philosophy, based on reading seventy-five to 100 books, to keep the horses thin for the benefit of their health and that he had kept them in that manner for a long period of time.

Miller's testimony purported to show that it was his belief that he was saving the horses' health because too much fat on a horse leads to adverse health issues. Miller's testimony also shows that in May 2009, an officer from PCAC went to Miller's property, informed Miller he was investigating a complaint that the horses were without water, and told Miller the horses were too thin. *See* Tr. p. 152. Miller also testified that he had been "under a microscope" for a long time because of the weight of the horses. *Id.* at 153. Miller explained that he was aware that someone had an "unusual interest" in his

horses, so he only kept a small amount of grain in the barn to prevent "some do-gooder" from overfeeding them. *Id.* at 149, 150. He stated that, when he came home to find that someone had fed the horses without his permission, he had no idea how much they had been fed, so for the next twenty-four hours he did not feed them anything. He testified, "I had no choice but to observe them closely and make sure it worked through their system." *Id.* at 150.

Regardless of Miller's philosophy regarding equine health, Dr. Rodenbarger explained that the horses were consuming less food than they needed and "that the care these horses were receiving was substandard, and that they were not being fed adequately." *Id.* at 83. Dr. Rodenbarger testified that the horses were anemic, which was caused by poor nutrition and parasite levels. He also testified that they had elevated muscle enzymes, indicating the breakdown of muscle after fat stores had been used or loss of strength. The evidence is sufficient to establish that Miller recklessly endangered the animals' health by failing to provide them adequate food so as to neglect the horses. To the extent he argues otherwise, Miller is asking us to reweigh the evidence. We decline to do so.

## II. Confiscation of Horses

Miller also argues his convictions should be reversed because the statutory requirements for confiscating the animals were not followed. Miller acknowledges he has been unable to locate case law mandating reversal and contends the appropriate standard of review is de novo.

Indiana Code Section 35–46–3–6 provides:

(a) This section does not apply to a vio-

lation of section 1[¹] of this chapter.

(b) Any law enforcement officer or any other person having authority to impound animals who has probable cause to believe there has been a violation of this chapter or IC 15–20–1–4 may take custody of the animal involved.

(c) The owner of an animal that has been impounded under this section may prevent disposition of the animal by an animal shelter that is caring for the animal by posting, not later than ten (10) days after the animal has been impounded, a bond with the court in an amount sufficient to provide for the animal's care and keeping for at least thirty (30) days, beginning from the date the animal was impounded. The owner may renew a bond by posting a new bond, in an amount sufficient to provide for the animal's care and keeping for at least an additional thirty (30) days, not later than ten (10) days after the expiration of the period for which a previous bond was posted. If a bond expires and is not renewed, the animal shelter may determine disposition of the animal, subject to court order. If the owner of an animal impounded under this section is convicted of an offense under this chapter or IC 15–20–1–4, the owner shall reimburse the animal shelter for the expense of the animal's care and keeping. If the owner has paid a bond under this subsection, the animal shelter may euthanize an animal if a veterinarian determines that an animal is suffering extreme pain.

(d) If the owner requests, the court having jurisdiction of criminal charges filed under this chapter or IC 15–20–1 shall hold a hearing to determine whether probable cause exists to believe that a violation of this chapter or IC 15–20–1

has occurred. If the court determines that probable cause does not exist, the court shall order the animal returned to its owner, and the return of any bond posted by its owner.

*(e) Whenever charges are filed under this chapter, the court shall appoint the state veterinarian under IC 15–17–4–1 or the state veterinarian's designee to:*

*(1) investigate the condition of the animal and the circumstances relating to the animal's condition; and*

*(2) make a recommendation to the court under subsection (f) regarding the confiscation of the animal.*

*(f) The state veterinarian or the state veterinarian's designee who is appointed under subsection (e) shall do the following:*

*(1) Make a recommendation to the court concerning whether confiscation is necessary to protect the safety and well-being of the animal.*

*(2) If confiscation is recommended under subdivision (1), recommend a manner for handling the confiscation and disposition of the animal that is in the best interests of the animal.*

*The state veterinarian or the state veterinarian's designee who submits a recommendation under this subsection shall articulate to the court the reasons supporting the recommendation.*

(g) The court:

(1) shall give substantial weight to; and

(2) may enter an order based upon;

a recommendation submitted under subsection (f).

(h) If a person is convicted of an offense under this chapter or IC 15–20–1, the

---

**1.** Indiana Code Section 35–46–3–1 pertains to the harboring of a non-immunized dog and is not relevant to the issue before us today.

court may impose the following additional penalties against the person:

(1) A requirement that the person pay the costs of caring for an animal involved in the offenses that are incurred during a period of impoundment authorized under subsection (b).

(2) An order terminating or imposing conditions on the person's right to possession, title, custody, or care of:

(A) an animal that was involved in the offense; or

(B) any other animal in the custody or care of the person.

(i) If a person's right to possession, title, custody, or care of an animal is terminated under subsection (h), the court may:

(1) award the animal to a humane society or other organization that has as its principal purpose the humane treatment of animals; or

(2) order the disposition of the animal as recommended under subsection (f).

(Emphasis added).

■ Miller contends that, because neither the state veterinarian nor his or her designee conducted an investigation or made a recommendation regarding confiscation of the horses as required by subsections (e) and (f), his convictions should be reversed. The State argues that the issue is waived because Miller raises it for the first time on appeal. Miller responds by pointing out that he raised it a motion to vacate the verdict filed after trial was completed.[2] Although Miller did raise the issue after trial, we believe his objection was not timely, resulting in waiver of the issue on appeal.

■ "Timely objection should be made to any improprieties that may occur during the course of a trial so that the trial judge may be informed and may take effective action to remedy the error or grievance complained of." *Burnett v. State*, 815 N.E.2d 201, 207 (Ind.Ct.App.2004). "Objections not timely raised to the trial court are waived on appeal." *Id.* Had Miller raised the issue, when charges were filed, as contemplated by subsection (e), the trial court could have appointed the state veterinarian or his or her designee to investigate, allowing the veterinarian to make a recommendation prior to trial. At the time Miller sought relief pursuant to subsections (e) and (f), however, he had already been convicted, making subsection (h) the applicable provision. Because Miller did not raise the issue in a timely manner, it is waived.

■ Waiver notwithstanding, the State asserts, and Miller does not dispute, that it had probable cause to impound the horses pursuant to subsection (b). Instead, Miller contends that subsections (e) and (f) were not complied with after the initial impoundment. He argues that a veterinarian's investigation "would have most certainly required" an interview with Miller, during which the veterinarian would have learned how Miller varied the feedings and why. Appellant's Br. p. 13. He also asserts, "if Miller can be shown that his standard of care was deficient, he would change." *Id.* at 14.

We do not see how the trial court's failure to comply with subsections (e) and (f) affects the validity of Miller's convictions. First, Miller's assertions that an investigation by the state veterinarian would have led to the conclusion that the horses were not neglected or would have allowed

---

**2.** Based on the chronological case summary, it appears the motion was denied because the trial court ordered the horses to be confiscated, to be forfeited, and to be put up for adoption.

Miller to change the manner in which he cared for the horses is rank speculation. Further, even if the state veterinarian would have determined that the horses should not have been confiscated, Miller offers no explanation as to why the State could not have continued to pursue the criminal neglect charges against him.[3] Finally, to the extent Miller was entitled to an opportunity to explain his theory of care, he presented his theory to the jury, and it was rejected. Without more, Miller has not established that the trial court's failure to comply with subsections (e) and (f) requires the reversal of his convictions.

### Conclusion

There is sufficient evidence to support Miller's convictions, and the trial court's failure to appoint the state veterinarian does not require the reversal of his convictions. We affirm.

Affirmed.

RILEY, J., and DARDEN, J., concur.

---

**3.** As for Miller's argument that he is seeking to hold the State to the law, we note that the statute requires the trial court, not the State, to appoint the state veterinarian.