**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**TIMOTHY P. BRODEN**
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**RYAN D. JOHANNINGSMEIER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ROBERT W. EVANS, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 79A04-1308-CR-386 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE TIPPECANOE SUPERIOR COURT
The Honorable Thomas H. Busch, Judge
Cause No. 79D02-1211-FA-16

**May 1, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**VAIDIK, Chief Judge**

## Case Summary

Robert Evans appeals his conviction for Class A felony dealing in methamphetamine. He argues that the trial court improperly admitted evidence regarding the results of a Draeger pump instrument test, which tests for the presence of ammonia, without first establishing the test's reliability. Additionally, Evans claims that the trial court erred in refusing to instruct the jury on his proposed jury instruction on constructive possession. We find that the test results were properly admitted and the court did not err in refusing to give Evans's tendered jury instruction. We therefore affirm the trial court.

## Facts and Procedural History

On an evening in November 2012, Pam Smith and Evans decided to make methamphetamine together. Evans and Pam went to Evans's mother's house to gather ingredients and tools to make methamphetamine. Tr. p. 231. The items were gathered and placed inside two backpacks, a black[1] backpack and a pink backpack. There was a green two-liter bottle inside the black backpack. *Id.* at 189.

After Evans's mother's house, Pam and Evans went to Kelley Brickey's house. The group ingested methamphetamines before deciding to take a taxi cab to Pam's house, which was located at 1533 N. 17th Street in Lafayette, Indiana ("the Smith Residence"), to make methamphetamine. Evans, Pam, and Brickey went into the house through the back door. Charles Hill, who lived directly behind the Smith Residence, saw Pam walking around the

---

[1] There is conflicting testimony as to whether the backpack carried by Evans was green or black. *Compare* Tr. p. 50 *with* Tr. p. 235. However, it is undisputed that Evans was carrying a dark-colored backpack when he entered the Smith Residence.

2

side of her house with a man and a woman that he did not recognize. *Id.* at 41. Pam and the man were carrying backpacks on their shoulders. *Id.* at 41, 50.

Once inside the house, Brickey, Pam, and Evans went down into the basement. Pam and Evans gathered all of the supplies to begin the process of making methamphetamine. Brickey saw Evans putting pills in the green two-liter bottle. Meanwhile, Pam lit incense and hung blankets on the windows and at the basement entrance to prevent the smell from traveling into the other parts of the house.

Meanwhile, Hill went to the Smith Residence to retrieve four movies that he had lent to one of the occupants of the house. He noticed that the smell inside was a "deadly chemical smell." *Id.* at 44. He grabbed his movies and ran out of the house. *Id.* at 45. Once outside, he fell to the ground because he could not stop coughing. *Id.* After he returned to his house, he called the police because he "knew [the odor] was something dangerous." *Id.*

Lafayette Police Department Officers Bernard Myers and Ryan French were dispatched to the Smith Residence in response to Hill's call. When the officers arrived, they walked around the house, and Officer Myers noticed that a vent pipe was emitting exhaust from the furnace that smelled like ammonia—a common smell during the process of making methamphetamine. The officers then knocked on the door and spoke to Elizabeth Smith, the primary leaseholder of the house. Elizabeth allowed the officers into the house to investigate.

The officers asked if there was anyone else in the house, and Elizabeth responded that her father was upstairs but she did not think anyone else was home. She then checked

3

the basement door, but it was locked. Elizabeth called out to ask if anyone was in the basement. Pam, Elizabeth's daughter, responded, and Elizabeth told Pam that the police were in the house. About a minute later, Pam emerged from the basement.

Officer Myers noticed that the smell of ammonia was coming from the basement. Both officers went into the basement to investigate. Before going into the basement, the officers asked if anyone else was there. No one responded. As the officers walked down the basement stairs, Officer Myers noticed a blanket covering the threshold of the basement. Once he pushed aside the blanket, he experienced an overwhelming smell of ammonia. The smell was so overpowering that it was nearly impossible to breathe. Both officers coughed and their throats burned from the smell. The police saw Evans sitting on a chair and Brickey sitting on the bed.

Officer Myers asked both Evans and Brickey to come to him because the odor of ammonia was so overwhelming. Officer Myers handcuffed Evans, and Officer French escorted Brickey up the stairs. Pam was also handcuffed. The officers did not search the basement or collect any evidence because it was unsafe to do so. *Id.* at 65. After exiting the basement, the officers called the fire department, emergency medical services, and the Indiana State Police Lab Team. Evans, Brickey, and Pam were arrested that evening for their involvement in the production of methamphetamine.

Indiana State Police Trooper Ryan Royer, a member of the Indiana State Police Clandestine Laboratory Response Team, was dispatched to the Smith Residence and arrived around 1:00 a.m. with Troopers Sean Schaffer and Kent Wainscott. Trooper Royer found several items that were associated with manufacturing methamphetamine, including

4

Rooto drain opener, lithium batteries, aluminum foil, coffee filters, Coleman camp fuel, salts, and cold packs containing ammonium nitrate. *Id.* at 120, 124-125, 139.

Trooper Royer also found a green soda bottle that he believed was the reaction vessel used to produce methamphetamine. He performed a Draeger test[2] to confirm that it was used to produce methamphetamine,[3] and the bottle tested positive for ammonia or another basic amine.[4] According to Trooper Royer, one can distinguish between ammonia and other basic amines based on differences in odor and temperature. Although Trooper Royer was not able to observe these differences because he was wearing gloves and a mask, Trooper Schaffer removed his personal protection equipment just as Trooper Royer was completing the Draeger test on the green bottle and noticed that it smelled like ammonia. Trooper Royer also examined a bottle cap from the basement and found methamphetamine residue on it. *Id.* at 171. Based on the items found, his observations in the basement, and the tests performed, Trooper Royer concluded that methamphetamine was being produced in the basement.

The State charged Evans with Class A felony dealing in methamphetamine, Class C felony possession of a Schedule II controlled substance, and Class B felony possession of methamphetamine.[5] Appellant's App. p. 82-84.

---

[2] A Draeger test is a test where a tube is used to test for the presence and concentration of a particular chemical compound. Tr. p. 130.

[3] Trooper Royer tested the two-liter bottle for ammonia because anhydrous ammonia is one of the ingredients necessary to make methamphetamine. Tr. p. 112.

[4] The tube labeled "ammonia" will test positive if ammonia or other basic amines are present in the chemical compound that is tested.

[5] Evans was charged with Class A felony dealing in methamphetamine instead of Class B felony dealing in methamphetamine because the Smith Residence is within 1000 feet of a public park. *See* Ind. Code § 35-48-4-1(b)(3)(B)(ii).

Just before trial, Evans filed a motion to suppress the results of the Draeger test because the State did not establish the test's reliability. *Id.* at 71. The trial court held a hearing on the motion to suppress. At the hearing, Trooper Royer testified that he used the Draeger test to determine if ammonia was present in the reaction vessel. The trial court decided to withhold judgment until a chemist could testify about whether the Draeger test is sufficiently reliable. Tr. p. 26-27.

The following day, Hailey Newton, an employee of the Laboratory Division of the Indiana State Police, testified outside the presence of the jury. She explained that she conducted a validation study of the Draeger test. According to Newton, there were no instances of false positives or false negatives. *Id.* at 86. The results of her study were also presented before the Clandestine Laboratory Investigating Chemist Association, and she was not familiar with any studies indicating that Draeger tests are unreliable. *Id.* at 87. The test is also used by the Drug Enforcement Agency and the Occupational Safety and Health Administration. *Id.*

Newton explained that a positive result on an ammonia Draeger tube indicates that ammonia or another basic amine is present. Moreover, that information combined with other observations, such as odor, temperature, or appearance of the chemical, can help one determine whether the substance tested was ammonia or another basic amine. *Id.* at 88, 90-91.

Officers must go through an annual eight-hour refresher course, which includes training on how to conduct a Draeger test. Ultimately, Newton stated that she believed the Draeger test is reliable. *Id.* at 86, 95-96.

6

After Newton's testimony, the trial court concluded:

> The fact that ammonia or another basic amine was present in the bottle, I think is the sort of thing that is generally accepted in the scientific community as the proper use of a Draeger test and there is no evidence that it isn't reliable and there is the evidence presented today that it is reliable. The---and especially in the context of how the jury should interpret the smell of ammonia that one or more witnesses will---at least two witnesses will testify to, the fact that there is a particular bottle which tested to have contained a basic amine is going to be, again, useful information that they won't be able to deduce from their own experience, so that as a skilled witness, not as a scientist, the officer can testify as to what the results of his test were to the extent of presence or absence. So the motion in limine is overruled.

*Id.* at 100-101. The trial court also distinguished the facts in this case from those in *West v. State*, 805 N.E.2d 909 (Ind. Ct. App. 2004), *trans. denied*. In that case the trial court excluded the results of the Draeger test because an officer provided only an overview of his training and how the Draeger test functions. Here, however, a chemist specifically testified about the reliability of the Draeger test. *Id.* at 101.

At the conclusion of the jury trial, Evans proposed a constructive-possession-in-a-home instruction, which stated:

> Possession of something may take two forms. One can possess an item directly, meaning that he/she has actual physical control over the item. Or, one can possession [sic] something constructively, meaning that he/she has the capability and intent to possess the item, even though actual physical control is absent. Evidence has been presented that other individuals may have visited at, or resided in, Elizabeth Smith's home. As such, possession of those premises was not exclusive to her. When possession of the premises on which drugs or their precursors is not exclusive, the inference of intent to maintain dominion and control over the items must be supported by additional circumstances pointing to the accused's knowledge of the nature of the drugs and/or precursors and their presence in her home. These additional circumstances can include incriminating statements the accused made, attempted flight or furtive gestures, proximity of the substances to the accused, location of the substances within the accused's plain view, and the combining of the substances with other items that the accused owned.

7

Appellant's App. p. 59. The trial court denied Evans's request because the instruction was already covered by the trial court's constructive-possession instruction and because it unnecessarily emphasized that Elizabeth was the primary leaseholder of the Smith Residence. Tr. p. 317. Instead, the trial tendered Instruction No. 14.156 of the Indiana Pattern Jury Instructions on possession:

> The word **"possess"** means to own or to exert control over. The word "possession" can take on several different, but related meanings.
> There are two kinds of "possession": actual possession and constructive possession. A person who knowingly has direct physical control of a thing at a given time is then in actual possession of it. A person who, although not in actual possession, knowingly has both the power and the intention at a given time to exercise control over a thing, either directly or through another person or persons, is then in constructive possession of it.
> Possession may be sole or joint. If one person alone has actual or constructive possession of a thing, then possession is sole. If two or more persons share actual or constructive possession of a thing, then possession is joint.
> Possession may be actual or constructive, and either alone or jointly with others.

Appellant's App. p. 32-33; *see also* Indiana Pattern Jury Instruction No. 14.156—Criminal (3d ed. 12/2003).

The jury found Evans guilty of all charges. At the sentencing hearing, the trial court merged Evans's convictions for Class C felony possession of a Schedule II controlled substance and Class B felony possession of methamphetamine into his Class A felony dealing-in-methamphetamine conviction. Tr. p. 378-79. The trial court then sentenced Evans to forty years in the Department of Correction.

Evans now appeals.

**Discussion and Decision**

8

Evans raises two issues on appeal. First, he asserts that the trial court erred in admitting the results of the Draeger test. Second, he argues that the trial court erred in refusing to give his proposed jury instruction on constructive possession.

## I. Admission of the Draeger Test Results

Evans first contends that the trial court erred in admitting the results of the Draeger test under Indiana Rule of Evidence 702. We review the trial court's decision to admit evidence based on a scientific process under an abuse of discretion standard. *Doolin v. State*, 970 N.E.2d 785, 787 (Ind. Ct. App. 2012), *trans. denied*. An abuse of discretion occurs where the decision is clearly against the logic and effect of the circumstances. *Id.*

Under Indiana Rule of Evidence 702(b), expert scientific testimony is admissible only if reliability is demonstrated to the trial court. *Id.* Indiana Evidence Rule 702 provides that:

> (a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
>
> (b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

In determining whether scientific evidence is reliable, "the trial court must determine whether such evidence appears sufficiently valid—or, in other words, trustworthy—to assist the trier of fact." *West*, 805 N.E.2d at 913. In so doing, the trial court must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology can properly be applied to the facts in issue. *Id.*

9

There is no specific test that must be considered in order to satisfy Rule 702(b). *Id.* The reliability of such evidence may be established "by . . . a sufficient foundation to persuade the trial court that the relevant scientific principles are reliable." *Bond v. State*, 925 N.E.2d 773, 779 (Ind. Ct. App. 2010), *trans. denied*.

Our Supreme Court has explained that the factors enumerated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), are helpful in determining whether evidence is admissible under Indiana Evidence Rule 702(b). *Turner v. State*, 953 N.E.2d 1039, 1050 (Ind. 2011). The *Daubert* factors include "whether the scientific theory or technique (1) can be and has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential error rate; (4) is governed by maintained standards controlling its operation; and (5) has gained widespread acceptance in a relevant scientific community." *Bond*, 925 N.E.2d at 779 (citing *Daubert*, 509 U.S. at 593-94). While all of these factors and additional factors may be relevant, none alone is dispositive, and not all of these factors must be present for a trial court to find certain evidence reliable. *Id.*; *see also McGrew v. State*, 682 N.E.2d 1289, 1292 (Ind. 1997). "'The adoption of Rule 702 reflected an intent to liberalize, rather than to constrict, the admission of reliable scientific evidence.'" *Turner*, 953 N.E.2d at 1050 (quoting *Sears Roebuck & Co. v. Manuilov*, 742 N.E.2d 453, 460 (Ind. 2001)). However, the proponent of the scientific evidence bears the burden of persuading the trial court that it is more likely than not that the scientific principles upon which the evidence relies are reliable. *Burnett v. State*, 815 N.E.2d 201, 209 (Ind. Ct. App. 2004).

Turning to this case, the State established a sufficient foundation to show that the Draeger test was reliable. Hailey Newton, an employee of the Laboratory Division of the Indiana State Police, testified that she conducted a validation study involving the Draeger test. Tr. p. 81-82. In her study, she tested the instrument for cross-reactivity with over sixty different types of chemicals and each test produced the expected result. *Id.* at 86. She never obtained a false positive, and her results did not differ from the manufacturer's own documented testing.[6] *Id.* at 85-86. Newton's study was presented to the Clandestine Laboratory Investigating Chemist Association. *Id.* at 87. Additionally, Newton testified that the test has been in existence since 1937 and that she was not familiar with any studies indicating that the test is unreliable. *Id.* Both Newton and Trooper Royer testified that the test is used by the Drug Enforcement Agency and the Occupational Safety and Health Administration. *Id.* at 18, 87.

We find this case distinguishable from *West*. In *West*, this Court determined that the foundational requirements for the reliability of a Draeger test were not established when an officer only testified about his training in administering the test and general information about how he performed the test. *West*, 805 N.E.2d at 913. Here, however, Newton testified to additional information regarding the Draeger test's reliability, including a validation study she performed and that in every instance the Draeger test results were exactly as expected. Additionally, she testified that she was not familiar with any study

---

[6] The manufacturer reports that a Draeger test has a standard deviation of ten to fifteen percent, but this refers to the amount of concentration of the chemical tested. Tr. p. 89. The Draeger test in this case was used to determine whether the chemical was present in the reaction vessel, not how much of it was present.

11

since the test was created in 1937 that indicated that the test is unreliable. Her testimony focused on the reliability of the Draeger test while the officer's testimony in *West* did not.

Evans also contends that the State failed to lay a foundation for the specific instrument used. Appellant's Br. p. 7. We note that Evans waived this claim because he did not object to the fact that Trooper Royer never identified the specifications of the instrument he used to test the green two-liter bottle. Instead, he only objected to the reliability of the test itself. Tr. p. 5-6; Appellant's App. p. 71-72. A defendant may not argue one ground for objection at trial and then raise a new ground for objection on appeal. *Turner*, 953 N.E.2d at 1058. Waiver notwithstanding, Trooper Royer testified that each instrument comes with specific manufacturer instructions. Officers who use the Draeger test device are trained in accordance with those instructions. Tr. p. 82. Trooper Royer testified that he followed the manufacturer's instructions in performing the test. *Id.* at 133. Therefore, Trooper Royer's failure to identify the specifications of the instrument did not affect the reliability of the test.

Even if the trial court erred by admitting the Draeger test, that error would have been harmless. An error in the admission of evidence is harmless "when the conviction is supported by such substantial independent evidence of guilt as to satisfy the reviewing court that there is no substantial likelihood that the questioned evidence contributed to the conviction." *Lafayette v. State*, 917 N.E.2d 660, 666 (Ind. 2009). There was overwhelming evidence that ammonia existed in the reaction vessel. Both Officer Myers and Officer French smelled ammonia coming from the vent pipe outside the house. Both officers also testified to an overwhelming smell of ammonia. There were also several independent

12

pieces of evidence that proved Evans was manufacturing methamphetamine, including the testimony of both Brickey and Pam. Brickey testified that she saw Evans put pills in the green two-liter bottle and shake it. Tr. p. 192. Pam also testified that she saw Evans crushing and using the pills. *Id.* at 261. Additionally, Pam testified that she saw Evans "burping" the two-liter bottle. *Id.* at 246, 277. She also saw Evans strip the batteries and use the cold packs, lye, mason jar, and Coleman camp fuel to make methamphetamine. *Id.* at 247-48.

Even without the results of the Draeger test, we are confident that there was sufficient independent evidence of guilt that a jury still would have found Evans guilty of Class A felony dealing in methamphetamine for manufacturing methamphetamine within one-thousand feet of a public park. Appellant's App. p. 82.

## II. Refusal to Tender Jury Instruction

Evans also contends that the trial court erred in refusing to tender his requested jury instruction. We will only reverse a trial court's refusal to give a jury instruction if doing so amounts to an abuse of discretion. *O'Connell v. State*, 970 N.E.2d 168, 172 (Ind. Ct. App. 2012).

We note that the purpose of jury instructions is "'to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict.'" *Id.* (quoting *Munford v. State*, 923 N.E.2d 11, 14 (Ind. Ct. App. 2010)). In determining whether the trial court abused its discretion by failing to give an instruction, we consider "'(1) whether the tendered instruction correctly states the law; (2) whether there was evidence presented at trial to

13

support giving the instruction; and, (3) whether the substance of the instruction was covered by other instructions that were given.'" *Kane v. State*, 976 N.E.2d 1228, 1230-31 (Ind. 2012) (quoting *Mayes v. State*, 744 N.E.2d 390, 394 (Ind. 2001)). We will only reverse based upon an instructional error if the defendant affirmatively demonstrates that the error prejudiced his substantial rights. *Washington v. State*, 840 N.E.2d 873, 888 (Ind. Ct. App. 2006), *trans. denied*.

The trial court tendered Instruction No. 14.156 of the Indiana Pattern Jury Instructions on possession:

> The word **"possess"** means to own or to exert control over. The word "possession" can take on several different, but related, meanings.
> There are two kinds of "possession": actual possession and constructive possession. A person who knowingly has direct physical control of a thing at a given time is then in actual possession of it. A person who, although not in actual possession, knowingly has both the power and the intention at a given time to exercise control over a thing, either directly or through another person or persons, is then in constructive possession of it.
> Possession may be sole or joint. If one person alone has actual or constructive possession of a thing, then possession is sole. If two or more persons share actual or constructive possession of a thing, then possession is joint.
> Possession may be actual or constructive, and either alone or jointly with others.

Appellant's App. p. 32-33; *see also* Indiana Pattern Jury Instruction No. 14.156—Criminal (3d ed. 12/2003). Evans submitted the following proposed jury instruction on the issue of constructive possession:

> Possession of something may take two forms. One can possess an item directly, meaning that he/she has actual physical control over the item. Or, one can possession [sic] something constructively, meaning that he/she has the capability and intent to possess the item, even though actual physical control is absent. Evidence has been presented that other individuals may have visited at, or resided in, Elizabeth Smith's home. As such, possession of those premises was not exclusive to her. When possession of the premises

14

on which drugs or their precursors is not exclusive, the inference of intent to maintain dominion and control over the items must be supported by additional circumstances pointing to the accused's knowledge of the nature of the drugs and/or precursors and their presence in her home. These additional circumstances can include incriminating statements the accused made, attempted flight or furtive gestures, proximity of the substances to the accused, location of the substances within the accused's plain view, and the combining of the substances with other items that the accused owned.

Appellant's App. p. 59. The court denied Evans's requested jury instruction because the trial court was already giving a constructive-possession instruction and because there is a danger when an instruction calls attention to any one particular circumstance that the jury might give that circumstance extra weight when it should consider all circumstances. Tr. p. 317.

Evans concedes that the trial court's instruction was an accurate statement of the law and supported by the evidence; however, he contends that the instruction does not "adequately cover the issue of constructive possession because it contains no factors that the jury may consider in determining that issue." Appellant's Br. p. 10.

We disagree that the trial court's instruction did not adequately cover the issue of constructive possession. Evans's theory of the case was that the suspected one-pot reaction vessel was already in the basement of the Smith Residence before he arrived that evening. Tr. p. 341-42. The court's instruction adequately explains that a person must knowingly have both the power and the intention at a given time to exercise control over the thing he possesses. *Thompson v. State*, 966 N.E.2d 112, 122 (Ind. Ct. App. 2012) ("In order to prove constructive possession, the State must show that the defendant has both (1) the intent to maintain dominion and control and (2) the capability to maintain dominion and control over the contraband." (citation omitted)), *trans. denied.*

15

Instead, the trial court properly denied Evans's requested instruction because it unnecessarily emphasized the fact that Elizabeth was the primary leaseholder of the Smith Residence. We have long disapproved of "[i]nstructions that unnecessarily emphasize one particular evidentiary fact, witness, or phase of the case . . . ." *Ludy v. State*, 784 N.E.2d 459, 461 (Ind. 2003). Here, by stating in the instruction where the events occurred, the jury may have been confused about its relevance to the case or given that factor extra weight in its deliberations regarding possession of the materials to make methamphetamine.[7]

Finally, we may reverse a refusal to give a jury instruction only if the defendant shows that his substantial rights were prejudiced. *Washington*, 840 N.E.2d at 888. Evans makes no argument in his brief that his substantial rights were affected by the trial court's refusal to tender his proposed jury instruction. *See* Appellant's Br. p. 8-10. Evans could not make this argument because both Brickey and Pam testified that Evans actually possessed the reaction vessel. Tr. p. 195, 277.

We conclude that the trial court did not abuse its discretion in declining to give Evans's proposed jury instruction because the trial court's instruction adequately covered the issue of constructive possession and because Evans's proposed jury instruction

---

[7] Evans argues that his instruction should have been approved because "the factors for consideration contained in Evans's tendered instruction are identical to those approved in *Speer v. State*, 995 N.E.2d 1, 10 (Ind. Ct. App. 2013), *trans. denied*. We agree with Evans that the description of what is required to prove constructive possession in *Speer* is correct and mirrors the language Evans tendered in his proposed jury instruction. However, *Speer* does not address the concern of the trial court—that Evans's proposed jury instruction unnecessarily emphasized the fact that Elizabeth was the primary leaseholder of the Smith Residence and may cause the jury to give extra weight to that circumstance.

unnecessarily emphasized the fact that Elizabeth was the primary leaseholder of the Smith Residence.

Affirmed.

NAJAM, J., and BROWN, J., concur.